# GLADSTONE, REALTORS, ET AL. *v.* VILLAGE OF BELLWOOD ET AL.

No. 77–1493.   Argued November 29, 1978—Decided April 17, 1979

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined.

REHNQUIST, J., filed a dissenting opinion, in which STEWART, J., joined, *post*, p. 116.

*Jonathan T. Howe* argued the cause for petitioners. With him on the briefs were *Russell J. Hoover, Barry Sullivan,* and *James A. McKenna.*

*F. Willis Caruso* argued the cause for respondents. With him on the brief was *Robert G. Schwemm.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Days, Harriet S. Shapiro,* and *Walter W. Barnett.**

MR. JUSTICE POWELL delivered the opinion of the Court.

Title VIII of the Civil Rights Act of 1968, 82 Stat. 81, as amended, 42 U. S. C. § 3601 *et seq.*, commonly known as the Fair Housing Act of 1968 (Act), broadly prohibits discrimination in housing throughout the Nation. This case presents both statutory and constitutional questions concerning standing to sue under Title VIII.

I

Petitioners in this case are two real estate brokerage firms, Gladstone, Realtors (Gladstone), and Robert A. Hintze, Realtors (Hintze), and nine of their employees. Respondents are the village of Bellwood, a municipal corporation and suburb of Chicago, one Negro and four white residents of Bellwood, and one Negro resident of neighboring Maywood. During

---

*\*William D. North* filed a brief for the National Association of Realtors as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Charles A. Bane, Thomas D. Barr, Robert A. Murphy,* and *Norman J. Chachkin* for the Lawyers' Committee for Civil Rights Under Law; and by *Martin E. Sloane* for the National Committee Against Discrimination in Housing.

*Arthur C. Thorpe* and *John J. Gunther* filed a brief for the National League of Cities et al. as *amici curiae.*

the fall of 1975, the individual respondents and other persons consulted petitioners, stating that they were interested in purchasing homes in the general suburban area of which Bellwood is a part. The individual respondents were not in fact seeking to purchase homes, but were acting as "testers" in an attempt to determine whether petitioners were engaging in racial "steering," i. e., directing prospective home buyers interested in equivalent properties to different areas according to their race.

In October 1975, respondents commenced an action under § 812 of the Act, 42 U. S. C. § 3612,[1] against Gladstone and its employees in the District Court for the Northern District of Illinois, alleging that they had violated § 804 of Title VIII, 42 U. S. C. § 3604.[2] Simultaneously, respondents filed a

[1] Section 812 provides in part:

"(a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction."

[2] Section 804 provides:

"As made applicable by section 803 and except as exempted by sections 803 (b) and 807, it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

"(e) For profit, to induce or attempt to induce any person to sell or

virtually identical complaint against Hintze and its sales-people in the same court. The complaints, as illuminated by subsequent discovery, charged that petitioners had steered prospective Negro home buyers toward an integrated area of Bellwood approximately 12 by 13 blocks in dimension and away from other, predominately white areas. White customers, by contrast, allegedly were steered away from the integrated area of Bellwood. Four of the six individual respondents reside in this "target" area of Bellwood described in the complaint.[3] The complaints further alleged that the "Village of Bellwood . . . has been injured by having [its] housing market . . . wrongfully and illegally manipulated to the economic and social detriment of the citizens of [the] village," and that the individual respondents "have been denied their right to select housing without regard to race and have been deprived of the social and professional benefits of living in an integrated society." App. 6, 99. Respondents requested monetary, injunctive, and declaratory relief.

Petitioners moved for summary judgment in both cases, arguing that respondents had "no actionable claim or standing to sue" under the statutes relied upon in the complaint, that there existed "no case or controversy between the parties within the meaning of Article III of the Constitution," and that respondents failed to satisfy the prudential requirements for standing applicable in the federal courts. *Id.,* at 78, 143. The District Judge presiding over the case against Gladstone and its employees decided that respondents were not within the

_____

rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin." 82 Stat. 83, as amended, 88 Stat. 729.

Respondents also claimed that petitioners had violated 42 U. S. C. § 1982.

[3] Respondent Perry is a resident of Bellwood, but lives outside the area allegedly affected by petitioners' steering practices. Respondent Sharp lives in Maywood. These respondents are Negroes.

class of persons to whom Congress had extended the right to sue under § 812. The court expressly adopted the reasoning of *TOPIC* v. *Circle Realty,* 532 F. 2d 1273 (CA9 1976), a case involving facts similar to those here. In *TOPIC* the Ninth Circuit decided that Congress intended to limit actions under § 812 of the Act to "direct victims" of Title VIII violations, even though under *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205 (1972), standing under § 810[4] of the Act, 42

---

[4] Section 810 provides in part:

"(a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved') may file a complaint with the Secretary [of HUD]. . . . Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. . . .

. . . . . .

"(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforcement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

"(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days

U. S. C. § 3610, extends to the broadest class of plaintiffs permitted by Art. III. Since the individual respondents had been acting only as testers and thus admittedly had not been steered away from any homes they might have wished to purchase, the court concluded that they were, at most, only indirect victims of Gladstone's alleged violations of the Act. As respondents' action was brought under § 812, the court ruled that they lacked standing under the terms of the Act. The court did not discuss Gladstone's contention that respondents lacked standing under Art. III and the prudential limitations on federal jurisdiction. The District Judge presiding over the case against Hintze adopted the opinion of the Gladstone court as his own and also granted summary judgment.

The Court of Appeals for the Seventh Circuit consolidated the cases for appellate review. It first considered the significance of the fact that the individual respondents were merely testers not genuinely interested in purchasing homes. The court noted that while this precluded respondents from arguing that they had been denied their right to select housing without regard to race, "the testers did . . . generate evidence suggesting the perfectly permissible inference that [petitioners] have been engaging, as the complaints allege, in the *practice* of racial steering with all of the buyer prospects who come through their doors." 569 F. 2d 1013, 1016 (1978) (emphasis in original). Thus, although the individual respondents lacked standing in their capacity as testers, they were entitled to prove that the discriminatory practices documented by

---

thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. . . ." 82 Stat. 85.

their testing deprived them, as residents of the adversely affected area, "of the social and professional benefits of living in an integrated society."

The Court of Appeals then turned to the question whether the Art. III minima for standing had been satisfied. Observing the similarity between the allegations of injury here and those accepted as constitutionally sufficient in *Trafficante,* it concluded that the individual respondents had presented a case or controversy within the meaning of Art. III. The court also read the complaints as alleging economic injury to the village itself as a consequence of the claimed racial segregation of a portion of Bellwood. Although this aspect of the case was not directly controlled by *Trafficante,* the court found that the requirements of Art. III had been satisfied.[5]

Having concluded that a case or controversy within the meaning of Art. III was before it, the Court of Appeals addressed the District Court's ruling that § 812 of the Act, unlike § 810, affords standing only to those directly injured by the discriminatory acts challenged. After considering the legislative history and recent federal-court decisions construing these provisions, the court concluded, contrary to the decision in *TOPIC* v. *Circle Realty, supra,* that §§ 810 and 812 provide alternative remedies available to precisely the same class of plaintiffs. The conclusion of this Court in *Trafficante* that standing under § 810 extends " 'as broadly as is permitted by Article III of the Constitution,' " 409 U. S., at 209, quoting *Hackett* v. *McGuire Bros., Inc.,* 445 F. 2d 442, 446 (CA3 1971), was seen as applicable to these cases brought under § 812. The Court of Appeals reversed the judgments of the District Court and remanded for further proceedings.

Petitioners sought review in this Court. We granted cer-

---

[5] The Court of Appeals agreed with the District Court that the Leadership Council for Metropolitan Open Communities, also a plaintiff in the two actions in the District Court, lacked standing. 569 F. 2d, at 1017. That ruling has not been challenged in this Court.

tiorari to resolve the conflict between the decision of the Court of Appeals in this case and that of the Ninth Circuit in *TOPIC,* and to consider the important questions of standing raised under Title VIII of the Civil Rights Act of 1968. 436 U. S. 956 (1978). With the limitation noted in n. 25, *infra,* we now affirm.

## II

In recent decisions, we have considered in some detail the doctrine of standing in the federal courts. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. . . . In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975).

The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 72 (1978); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 260–261 (1977); *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 38 (1976); *Warth* v. *Seldin, supra,* at 499; *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973). Otherwise, the exercise of federal jurisdiction "would be gratuitous and thus inconsistent with the Art. III limitation." *Simon* v. *Eastern Kentucky Welfare Rights Org., supra,* at 38.

Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding

questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim. For example, a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one "shared in substantially equal measure by all or a large class of citizens." *Warth* v. *Seldin,* 422 U. S., at 499. He also must assert his own legal interests, rather than those of third parties.[6] *Ibid.* Accord, *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 263.

Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." *Warth* v. *Seldin,* 422 U. S., at 501. In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself," *ibid.,* that is likely to be redressed if the requested relief is granted. *Simon* v. *Eastern Kentucky Welfare Rights Org., supra,* at 38.

## III

Petitioners have insisted throughout this litigation that respondents lack standing under the terms of the Act. Their argument, which was accepted by the District Court, is that while § 810 provides standing to the fullest extent permitted by Art. III, see *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S., at 209, § 812, under which respondents proceed, affords standing only to "direct victims" of the conduct proscribed by Title VIII. Respondents, on the other hand, argue

---

[6] There are other nonconstitutional limitations on standing to be applied in appropriate circumstances. See, *e. g., Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 39 n. 19 (1976) ("the interest of the plaintiff, regardless of its nature in the absolute, [must] at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises," quoting *Data Processing Service* v. *Camp,* 397 U. S. 150, 153 (1969)).

that the Court of Appeals correctly concluded that §§ 810 and 812 are alternative remedies available to precisely the same class of plaintiffs. The issue is a critical one, for if the District Court correctly understood and applied § 812, we do not reach the question whether the minimum requirements of Art. III have been satisfied. If the Court of Appeals is correct, however, then the constitutional question is squarely presented.[7]

Petitioners' argument centers on two points. First, § 810 uses the term "person aggrieved," defined as "[a]ny person who claims to have been injured by a discriminatory housing practice," to describe those who may seek relief under that section. By contrast, § 812 lacks this broad definition of potential plaintiffs, referring explicitly only to civil suits brought to enforce the rights granted elsewhere in the Act. Second, under § 810 a plaintiff must first seek informal conciliation of housing discrimination disputes from the Department of Housing and Urban Development (HUD) and appropriate state agencies before pursuing a judicial remedy. See n. 4, *supra*. But under § 812 a complainant may proceed directly to federal court.

From these facts, petitioners infer a congressional plan to create two distinct, though overlapping, remedial avenues under Title VIII. Under § 810, they argue, Congress intended to reach *all* victims—both direct and indirect—of housing discrimination by referring generally to those "aggrieved." But in order to protect the courts from the volume of litiga-

---

[7] It is not clear whether our opinion in *Trafficante* was intended to construe § 812 as well as § 810. Although certain intervening plaintiffs in that case asserted standing under § 812, but not § 810, see *Trafficante* v. *Metropolitan Life Ins. Co.*, 322 F. Supp. 352, 353 (ND Cal.), aff'd, 446 F. 2d 1158, 1161 n. 5 (CA9 1971), and the Court failed to disclaim a decision on the former provision, the opinion focuses exclusively on § 810. Rather than attempt to reconstruct whatever understanding of the relationship between §§ 810 and 812 might have been implicit in *Trafficante*, we consider the merits of this important statutory question directly.

tion such plaintiffs might generate, to make available the administrative expertise of state and federal agencies, and to involve state and local governments in national fair housing goals, Congress interposed administrative remedies as a prerequisite to the invocation of the federal judicial power by "indirect victims" of Title VIII violations.

Since § 812 does not specifically refer to "persons aggrieved" and allows direct access to the courts by those invoking it, petitioners argue that Congress must have intended this provision to be available only to those most in need of a quick, authoritative solution: those directly victimized by a wrongful refusal to rent or sell a dwelling place or by some other violation of the Act. The construction of § 812 accepted by the Court of Appeals, they contend, is illogical because it would permit a plaintiff simply to ignore, at his option, the scheme of administrative remedies set up in § 810. Thus, according to petitioners, "direct victims" may proceed under either § 810 or § 812, while those injured only indirectly by housing discrimination may proceed, if at all, under the former provision alone.

Finally, petitioners claim that the legislative history of the Act supports their view. That history reflects that Congress was concerned that Title VIII not be used as an instrument of harassment.[8] Petitioners contend that permitting individuals such as respondents, who have not been harmed directly by petitioners' alleged conduct, to invoke § 812 provides substantial opportunity for abuse of that kind.

We find this construction of Title VIII to be inconsistent with the statute's terms and its legislative history. Nothing in the language of § 812 suggests that it contemplates a more restricted class of plaintiffs than does § 810. The operative language of § 812 is phrased in the passive voice—"[t]he rights granted by sectio[n] 804 . . . may be enforced by civil

---

[8] This concern was expressed clearly in connection with an amendment to § 804 proposed by Senator Allott. See 114 Cong. Rec. 5515 (1968).

actions in appropriate United States district courts"—simply avoiding the need for a direct reference to the potential plaintiff. The absence of "person aggrieved" in § 812, therefore, does not indicate that standing is more limited under that provision than under § 810. To the contrary, § 812 on its face contains no particular statutory restrictions on potential plaintiffs.[9]

Contrary to petitioners' contention, § 810 is not structured to keep complaints brought under it from reaching the federal courts, or even to assure that the administrative process runs its full course. Section 810 (d) appears to give a complainant the right to commence an action in federal court whether or not the Secretary of HUD completes or chooses to pursue conciliation efforts.[10] Thus, a complainant under § 810 may

---

[9] Both petitioners and the dissenting opinion, *post,* at 124, emphasize the language of § 812 that "[t]he rights granted by sectio[n] 804 . . . may be enforced by civil actions . . . ." See n. 1, *supra.* They argue that since § 804 on its face grants no right to have one's community protected from the harms of racial segregation, respondents have no substantive rights to enforce under § 812.

That respondents themselves are not granted substantive rights by § 804, however, hardly determines whether they may sue to enforce the § 804 rights of others. See *supra,* at 99–100. If, as is demonstrated in the text, Congress intended standing under § 812 to extend to the full limits of Art. III, the normal prudential rules do not apply; as long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed. The central issue at this stage of the proceedings is not who possesses the legal rights protected by § 804, but whether respondents were genuinely injured by conduct that violates *someone's* § 804 rights, and thus are entitled to seek redress of that harm under § 812.

[10] The lower federal courts are divided over the question whether a Title VIII complainant who has enlisted the aid of HUD under § 810 must commence the civil action referred to in § 810 (d) no later than 60 days after the filing of his administrative complaint, even if HUD has not completed its conciliatory efforts by that time. Several courts believe the plain language of § 810 (d), see n. 4, *supra,* requires this result. *Green* v. *Ten Eyck,* 572 F. 2d 1233, 1240–1243 (CA8 1978); *Tatum* v. *Myrick,*

resort to federal court merely because he is dissatisfied with the results or delays of the conciliatory efforts of HUD.[11] The most plausible inference to be drawn from Title VIII is that Congress intended to provide all victims of Title VIII violations two alternative mechanisms by which to seek redress: immediate suit in federal district court, or a simple, inexpensive, informal conciliation procedure, to be followed by litigation should conciliation efforts fail.[12]

---

425 F. Supp. 809, 810–812 (MD Fla. 1977); *Sumlin* v. *Brown*, 420 F. Supp. 78, 80–82 (ND Fla. 1976); *Brown* v. *Blake & Bane, Inc.*, 402 F. Supp. 621, 622 (ED Va. 1975); *Young* v. *AAA Realty Co.*, 350 F. Supp. 1382, 1385–1387 (MDNC 1972). Others, following HUD's interpretation of § 810 (d), see 24 CFR §§ 105.16 (a), 105.34 (1978), believe that the only time limitation on one who has properly complained to HUD is that a civil action be commenced within 30 days of notice of HUD's failure to negotiate a settlement. *Logan* v. *Richard E. Carmack & Assoc.*, 368 F. Supp. 121, 122–123 (ED Tenn. 1973); *Brown* v. *Ballas*, 331 F. Supp. 1033, 1036 (ND Tex. 1971). This case does not require us to resolve this conflict, and we express no views on it. But regardless of which position is correct, it is clear that § 810 does not serve as a screening mechanism to deflect certain classes of Title VIII grievances from the federal courts.

[11] Section 810 does appear to restrict access to the federal courts in one respect not paralleled by § 812. To the extent state or local remedies prove adequate, a complainant under § 810 is required to pursue them. Thus, under § 810 (c), the Secretary of HUD must suspend his conciliation efforts if local remedies providing protection equivalent to that of Title VIII are being carried forward by the appropriate public officials. Such deferral by the Secretary apparently delays the availability of judicial review under § 810 (d). Section 810 (d) also conditions the availability of its civil action on the absence of an equivalent state or local judicial remedy. Section 812 contains no such limitation.

We are convinced that neither these differences nor the variations between § 810 and § 812 relied upon by the dissent, see *post*, at 124–126, imply that § 810 is directed to a larger class of plaintiffs than is § 812. The legislative history, discussed in the text, contradicts any such suggestion. See *infra*, at 105–108, and n. 20.

[12] It is instructive to compare the administrative remedy of § 810 with that provided by § 706 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5. Under § 810 (d), a complainant may simply bypass

Although the legislative history gave little help in determining the proper scope of standing under § 810, see *Trafficante,* 409 U. S., at 210, it provides substantial and rather specific support for the view that §§ 810 and 812 are available to precisely the same class of plaintiffs.[13]   Early legislative proposals for fair housing legislation contained no administrative remedies.[14]   The nonjudicial avenue of relief was later added on the theory that it would provide a more expeditious and less burdensome method of resolving housing complaints.[15]

the conciliatory efforts of HUD by commencing a civil action, apparently without notice to the agency, 30 days after filing his complaint.   Under § 706 (f) (1), by contrast, a complainant must allow the Equal Employment Opportunity Commission a full 180 days to negotiate a settlement, and he must obtain a "right-to-sue" letter before proceeding in federal court.   Moreover, under § 706 (b), the EEOC is instructed to make a judgment on the merits of the administrative complaints it receives by dismissing those it does not have reasonable cause to believe are true.   No such administrative statement on the merits of a § 810 complaint is required; the Secretary of HUD is asked only to indicate whether he "intends to resolve" a complaint.   Finally, under § 706 (f) (1), the EEOC may elect to bring suit itself, thereby pre-empting the individual complainant's right to commence the litigation and exercising important supervision over the conduct of the case.   The Secretary of HUD enjoys no similar authority under § 810.   From these and other differences between the two statutes, it is apparent that § 810, unlike § 706, does not provide an effective administrative buffer between the federal courts and individual complainants.

   [13] For a general review of the legislative history of Title VIII, see Dubofsky, Fair Housing: A Legislative History and a Perspective, 8 Washburn L. J. 149 (1969).

   [14] Three bills containing fair housing provisions were introduced in Congress in 1966: S. 3296, 89th Cong., 2d Sess.; H. R. 14770, 89th Cong., 2d Sess.; H. R. 14765, 89th Cong., 2d Sess.   As introduced, they provided for judicial enforcement only.

   [15] Explaining the addition of administrative remedies to H. R. 14765, one of the bills introduced in 1966, Representative Conyers stated:

   "Experience with comparable State and local agencies repeatedly has shown that the administrative process is quicker and fairer. It more quickly implements the rights of the person discriminated against and also quickly resolves frivolous and otherwise invalid complaints.   Conciliation

There is no evidence that Congress intended to condition access to the courts on a prior resort to the federal agency. To the contrary, the history suggests that all Title VIII complainants were to have available immediate judicial review. The alternative, administrative remedy was then offered as an option to those who desired to use it.

This apparently was the understanding of Representative Celler who, as chairman of the House Judiciary Committee, summarized the Act on the floor of the House.[16] Similar perceptions were reflected in reports on the proposed legislation by the Department of Justice [17] and the House Judiciary

is easier in an informal administrative procedure than in the formal judicial process. Also individual court suits would place a greater burden of expense, time and effort on not only the plaintiff but on all other parties involved, including the seller, broker and mortgage financier, and on the judicial system itself." 112 Cong. Rec. 18402 (1966).

Fair housing legislation introduced in 1967 similarly provided for administrative relief, which again was justified in terms of its perceived advantages to litigants over judicial review. Hearings on S. 1358 et al. before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 108 (testimony of Roy Wilkins, Executive Director, NAACP, and Chairman, Leadership Conference on Civil Rights).

The administrative remedies in the 1966 and 1967 proposals would have granted substantive enforcement powers to HUD. Although Title VIII, enacted in 1968, provided for only informal, conciliatory efforts by that agency, petitioners have identified nothing in the legislative history suggesting that the purpose for including an administrative avenue of relief had changed from that stated with respect to the 1966 and 1967 bills.

[16] In describing the enforcement provisions of Title VIII, Representative Celler stated: "In addition to administrative remedies, the bill authorizes immediate civil suits by private persons within 180 days after the alleged discriminatory housing practice occurred . . . ." 114 Cong. Rec. 9560 (1968).

[17] The Justice Department report explained an amendment to the proposed Fair Housing Act offered by Senator Dirksen, which contained the enforcement provisions ultimately enacted as §§ 810 and 812. It states:

"In addition to the administrative remedy provided through the Department of Housing and Urban Development, the bill provides for an

Committee.[18]  HUD, the federal agency primarily assigned to implement and administer Title VIII, consistently has treated §§ 810 and 812 as alternative remedial provisions.[19]  Under familiar principles, see *Teamsters* v. *Daniel*, 439 U. S. 551, 566 n. 20 (1979); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965), and as we stated in *Trafficante, supra,* at 210, the agency's interpretation of the statute ordinarily commands considerable deference.

Petitioners have identified nothing in the legislative history contrary to this view.  Their reliance on the expressed intent that Title VIII not be used for harassment is unconvincing. Nowhere does the history of the Act suggest that Congress attempted to deter possible harassment by limiting standing under § 812.  Indeed, such an attempt would have been

---

immediate right to proceed by civil action in an appropriate Federal or State court."  114 Cong. Rec. 4908 (1968).

[18] The House Judiciary Committee Report states:

"Section 812 states what is apparently an alternative to the conciliation-then-litigation approach [of § 810]: an *aggrieved person* within 180 days after the alleged discriminatory practice occurred, may, without complaining to HUD, file an action in the appropriate U. S. district court."  *Id.,* at 9612 (emphasis added).

The use of the term "aggrieved person" to refer to potential plaintiffs under § 812, as well as the reference to the § 812 remedy as an alternative to that of § 810, indicates that the authors of this Report believed the two sections were intended to reach a single class of plaintiffs.

[19] In its regulations describing the process of administrative conciliation under § 810, HUD provides that every "person aggrieved [who files a complaint with HUD] shall be notified of . . . his right to bring court action under sections 810 and 812."  24 CFR § 105.16 (a) (1978).  The regulations suggest no distinction between complainants under § 810 and plaintiffs under § 812.

In a handbook designed for internal agency use, § 812 is described as an "additional remed[y] for discriminatory housing practices [that] may be pursued concurrently with the complaint procedure [of § 810]." Department of Housing and Urban Development, Title VIII Field Operations Handbook 59 (1971).

pointless, given the relatively easy access to the courts provided by § 810.[20]

Most federal courts that have considered the issue agree that §§ 810 and 812 provide parallel remedies to precisely the same prospective plaintiffs. *E. g., Wheatley Heights Neighborhood Coalition* v. *Jenna Resales Co.,* 429 F. Supp. 486, 489–492 (EDNY 1977); *Village of Park Forest* v. *Fairfax Realty,* P–H 1 EOHC ¶ 13,699, pp. 14,467–14,468 (ND Ill. 1975); *Fair Housing Council* v. *Eastern Bergen County Multiple Listing Serv., Inc.,* 422 F. Supp. 1071, 1081–1083 (NJ 1976). See also *Howard* v. *W. P. Bill Atkinson Enterprises,* 412 F. Supp. 610, 611 (WD Okla. 1975); *Miller* v. *Poretsky,* 409 F. Supp. 837, 838 (DC 1976); *Young* v. *AAA Realty Co.,* 350 F. Supp. 1382, 1384–1385 (MDNC 1972); *Crim* v. *Glover,* 338 F. Supp. 823, 825 (SD Ohio 1972); *Johnson* v. *Decker,* 333 F. Supp. 88, 90–92 (ND Cal. 1971); *Brown* v. *Lo Duca,* 307 F. Supp. 102, 103–104 (ED Wis. 1969). The notable exception is the Ninth Circuit in *TOPIC* v. *Circle Realty,* 532 F. 2d 1273 (1976), upon which petitioners rely. For the rea-

---

[20] Although the legislative history is not free from some ambiguity, we do not agree with the view of it taken by the dissenting opinion. See *post,* at 126–128. The fact that, under Senator Miller's amendment, Title VIII complainants choosing to avail themselves of the informal, administrative procedures under § 810 are required to exhaust state remedies equivalent to Title VIII does not compel any particular conclusion about the size of the class to which § 812 extends. It was not irrational for Congress to conclude that, even with its limited exhaustion requirement, the incentive of § 810's simple, inexpensive conciliation procedure, as opposed to the immediate commencement of a formal lawsuit in federal district court under § 812, would be an attractive alternative to many of those aggrieved under Title VIII. Thus, under our construction of § 812, the exhaustion requirement of § 810 is not rendered meaningless. Apart from the argument based on the Miller amendment, the dissent relies on nothing more than an isolated, rhetorical remark by one Senator. Nothing in the legislative history or the administrative practices of HUD affirmatively supports the view that standing under § 810 is not identical to that under § 812.

sons stated, we believe that the Court of Appeals in this case correctly declined to follow *TOPIC*. Standing under § 812, like that under § 810, is " 'as broa[d] as is permitted by Article III of the Constitution.' " *Trafficante*, 409 U. S., at 209.[21]

## IV

We now consider the standing of the village of Bellwood and the individual respondents in light of Art. III. We "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party," *Warth* v. *Seldin*, 422 U. S., at 501, as standing was challenged largely on the basis of the pleadings.[22]

## A

The gist of Bellwood's complaint is that petitioners' racial steering effectively manipulates the housing market in the

---

[21] Petitioners argue that regardless of the scope of standing under § 812, the village of Bellwood cannot sue under that provision since it is not a "private person" as referred to in the caption to § 812.

The Court of Appeals noted that "[i]n a single sentence at oral argument, counsel for [petitioners] advanced the argument, not mentioned in their brief, that the Village lacks standing because it is not a 'person' as defined in [§ 802 (d)]." 569 F. 2d, at 1020 n. 8. The court rejected this contention, reasoning that the inclusion of "corporation" in the Act's definition of person encompassed municipal corporations such as Bellwood. *Ibid.* In this Court, petitioners have not argued that the village is not a "person," contending instead that it is not a "private person." Petitioners thus have presented a variant of the question raised belatedly in the Court of Appeals and given, perhaps deservedly, only cursory treatment there. Under these circumstances, the question whether Bellwood is a "private person" entitled to sue under § 812 is not properly before us, and we express no views on it.

[22] In addition to the complaints, the records in these cases contain several admissions by respondents, answers to petitioners' interrogatories, and exhibits appended to those answers, including maps of Bellwood. As did the courts below and the parties themselves, we accept as true the facts contained in these discovery materials for the purposes of the standing issue.

described area of the village: Some whites who otherwise would purchase homes there do not do so simply because petitioners refrain from showing them what is available; conversely, some Negroes purchase homes in the affected area solely because petitioners falsely lead them to believe that no suitable homes within the desired price range are available elsewhere in the general area. Although the complaints are more conclusory and abbreviated than good pleading would suggest, construed favorably to Bellwood they allege that this conduct is affecting the village's racial composition, replacing what is presently an integrated neighborhood with a segregated one.

The adverse consequences attendant upon a "changing" neighborhood can be profound. If petitioners' steering practices significantly reduce the total number of buyers in the Bellwood housing market, prices may be deflected downward. This phenomenon would be exacerbated if perceptible increases in the minority population directly attributable to racial steering precipitate an exodus of white residents. Cf. *Zuch* v. *Hussey,* 394 F. Supp. 1028, 1030, 1054 (ED Mich. 1975), order aff'g and remanding, 547 F. 2d 1168 (CA6 1977); *Barrick Realty, Inc.* v. *City of Gary,* 354 F. Supp. 126, 135 (ND Ind. 1973), aff'd, 491 F. 2d 161 (CA7 1974); *United States* v. *Mitchell,* 335 F. Supp. 1004, 1005 (ND Ga. 1971), aff'd *sub nom. United States* v. *Bob Lawrence Realty, Inc.,* 474 F. 2d 115 (CA5), cert. denied, 414 U. S. 826 (1973).[23] A significant reduction in property values directly injures a

---

[23] *Zuch* and *Mitchell* were cases in which real estate brokers were accused of "blockbusting," *i. e.,* exploiting fears of racial change by directly perpetuating rumors and soliciting sales in target neighborhoods. Respondents have not alleged that petitioners engaged in such unprincipled conduct, but the description in those cases of the reaction of some whites to a perceived influx of minority residents underscores the import of Bellwood's allegation that petitioners' sales practices threaten serious economic dislocation to the village.

municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services. Other harms flowing from the realities of a racially segregated community are not unlikely.[24] As we have said before, "[t]here can be no question about the importance" to a community of "promoting stable, racially integrated housing." *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 94 (1977). If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.

## B

The individual respondents appeared before the District Court in two capacities. First, they and other individuals had acted as testers of petitioners' sales practices. In this Court, however, respondents have not pressed the claim that they have standing to sue as testers, see Brief for Respondents 14–15, and we therefore do not reach this question. Second, the individual respondents claimed to be injured as homeowners in the community against which petitioners' alleged steering has been directed. It is in this capacity that they claim standing to pursue this litigation.

Four of the individual respondents actually reside within the target area of Bellwood. They claim that the transformation of their neighborhood from an integrated to a predominantly Negro community is depriving them of "the social and professional benefits of living in an integrated society." This allegation is similar to that presented in *Trafficante.* In that case, a Negro and a white resident of a large apartment com-

---

[24] It has been widely recognized, for example, that school segregation is linked closely to housing segregation. See, *e. g., Lee* v. *Nyquist,* 318 F. Supp. 710, 717 (WDNY 1970) (three-judge court), summarily aff'd, 402 U. S. 935 (1971); National Advisory Commission on Civil Disorders, Report 237 (1968); 114 Cong. Rec. 2276 (1968) (remarks of Sen. Mondale).

plex in San Francisco complained that the landlord's exclusion of nonwhites from the complex stigmatized them as residents of a "white ghetto" and deprived them of the social and professional advantages of living in an integrated community. Noting the importance of the "benefits from interracial associations," 409 U. S., at 210, and in keeping with the Court's recent statement that noneconomic injuries may suffice to provide standing, *Sierra Club* v. *Morton,* 405 U. S. 727, 734–735 (1972), we concluded that this injury was sufficient to satisfy the constitutional standing requirement of actual or threatened harm.

Petitioners argue that *Trafficante* is distinguishable because the complainants in that case alleged harm to the racial character of their "community," whereas respondents refer only to their "society." Reading the complaints as a whole, and remembering that we encounter these allegations at the pleading stage, we attach no particular significance to this difference in word choice. Although an injury to one's "society" arguably would be an exceptionally generalized harm or, more important for Art. III purposes, one that could not conceivably be the result of these petitioners' conduct, we are obliged to construe the complaint favorably to respondents, against whom the motions for summary judgment were made in the District Court. So construed, and read in context, the allegations of injury to the individual respondents' "society" refer to the harm done to the residents of the carefully described neighborhood in Bellwood in which four of the individual respondents reside.[25] The question before us,

---

[25] As previously indicated, n. 3, *supra,* neither respondent Perry nor respondent Sharp resides within the target neighborhood of Bellwood. We read the complaints as claiming injury only to that area and its residents, and we are unable to find any allegations of harm to individuals residing elsewhere. On the record before us, we therefore conclude that summary judgment as to these two respondents was appropriate. We note, however, that the standing issue as framed by the District Court

therefore, is whether an allegation that this particular area is losing its integrated character because of petitioners' conduct is sufficient to satisfy Art. III.[26]

Petitioners suggest that there is a critical distinction between an apartment complex, even one as large as that in *Trafficante*,[27] and a 12- by 13-block residential neighborhood. Although there are factual differences, we do not view them as controlling in this case. We note first that these differences arguably may run in favor of standing for the individual respondents, according to how one views his living environment. Apartment dwellers often are more mobile, with less attachment to a community as such, and thus are able to react more quickly to perceived social or economic changes.

_____

was simply whether respondents were direct, as opposed to indirect, victims of the steering practices of petitioners. Viewed in that context, it made no difference whether Perry and Sharp were residents of the target area or not, for they would be found to be without standing in either event. As stated in Part III, *supra*, the District Court's perception of the standing question was incorrect. Only upon reaching this Court has the failure of the complaints to make sufficient allegations as to these two individuals been put in issue clearly. Although we intimate no view as to whether persons residing outside of the target neighborhood have standing to sue under § 812 of Title VIII, we do not foreclose consideration of this question if, on remand, the District Court permits respondents Perry and Sharp to amend their complaints to include allegations of actual harm.

[26] Apart from the use of "community" rather than "society," the complaint in *Trafficante* differed from those here in that it alleged that a segregated community was prevented from becoming integrated because of the defendant's conduct. Here, by contrast, respondents claim that an integrated neighborhood is becoming a segregated community because of petitioners' conduct. We find this difference unimportant to our analysis of standing. In both situations, the deprivation of the benefits of interracial associations constitutes the alleged injury.

[27] The apartment complex in *Trafficante* housed 8,200 tenants. 409 U. S., at 206. The population of Bellwood, of which the target neighborhood is only a part, was estimated at 20,969 in 1975. Department of Commerce, Bureau of the Census, Population Estimates and Projections, Series P-25, No. 661, p. Ill. 15 (1977).

The homeowner in a suburban neighborhood such as Bellwood may well have deeper community attachments and be less mobile. Various inferences may be drawn from these and other differences, but for the purpose of standing analysis, we perceive no categorical distinction between injury from racial steering suffered by occupants of a large apartment complex and that imposed upon residents of a relatively compact neighborhood such as Bellwood.[28]

The constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than apartment buildings. Rather, they are determined by the presence or absence of a "distinct and palpable injury," *Warth* v. *Seldin,* 422 U. S., at 501, to respondents resulting from petitioners' conduct. A "neighborhood" whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident. The presence of a genuine injury should be ascertainable on the basis of discrete facts presented at trial.[29]

---

[28] See *Shannon* v. *HUD,* 305 F. Supp. 205, 208, 211 (ED Pa. 1969), aff'd in part, 436 F. 2d 809, 817–818 (CA3 1970) (residents in a neighborhood affected by urban renewal project have standing to challenge the project's impact on the neighborhood's racial balance). Accord, *Fox* v. *HUD,* 416 F. Supp. 954, 955–956 (ED Pa. 1976); *Marin City Council* v. *Marin County Redevelopment Agency,* 416 F. Supp. 700, 702, 704 (ND Cal. 1975). See also Comment, The Fair Housing Act: Standing for the Private Attorney General, 12 Santa Clara Law. 562, 568–571 (1972).

[29] In addition to evidence about the community, it will be relevant at trial to consider the nature and extent of the business of the petitioner real estate brokers. This should include an inquiry into the extent of their participation in the purchase, sale, and rental of residences in the target area, the number and race of their customers, and the type of housing desired by customers. Evidence of this kind may be relevant to the establishment of the necessary causal connection between the alleged conduct and the asserted injury. Respondents apparently attempted to

In addition to claiming the loss of social and professional benefits to the individual respondents, the complaints fairly can be read as alleging economic injury to them as well.[30] The most obvious source of such harm would be an absolute or relative diminution in value of the individual respondents' homes. This is a fact subject to proof before the District Court, but convincing evidence that the economic value of one's own home has declined as a result of the conduct of another certainly is sufficient under Art. III to allow standing to contest the legality of that conduct.

## V

We conclude that the facts alleged in the complaints and revealed by initial discovery are sufficient to provide standing under Art. III. It remains open to petitioners, of course, to contest these facts at trial.[31] The adequacy of proof of respondents' standing is not before us, and we express no views on it.[32] We hold only that the summary judgments should not have been entered on the records before the District Court, except with respect to respondents Perry and Sharp.

---

discover such information, but summary judgment was entered against them before this was accomplished.

[30] The complaints state that petitioners have manipulated the housing market of Bellwood "to the economic and social detriment of the citizens of [the] village." App. 6, 99.

[31] Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.

[32] The federal courts that have considered the question have concluded that racial steering is prohibited by Title VIII. *E. g., Wheatley Heights Neighborhood Coalition* v. *Jenna Resales Co.,* 429 F. Supp. 486, 488 (EDNY 1977); *United States* v. *Real Estate One, Inc.,* 433 F. Supp. 1140, 1144 (ED Mich. 1977); *Fair Housing Council* v. *Eastern Bergen County Multiple Listing Serv., Inc.,* 422 F. Supp. 1071, 1075 (NJ 1976). We do not reach this issue, as it is not presented by this case.

See n. 25, *supra.* Subject to this exception, the judgment of the Court of Appeals is affirmed.[33]

*So ordered.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART joins, dissenting.

Title VIII of the Civil Rights Act of 1968, 82 Stat. 81, as amended, 42 U. S. C. § 3601 *et seq.,* which outlaws discrimination in virtually all aspects of the sale or rental of housing, provides two distinct and widely different routes into federal court. Under § 810, 42 U. S. C. § 3610,[1] a "person aggrieved,"

---

[33] The Court of Appeals found it unnecessary to consider respondents' standing under § 1982. For this reason, and because of our decision with respect to respondents' standing under Title VIII, we do not reach the § 1982 issue.

[1] Section 810 provides:

"(a) Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved') may file a complaint with the Secretary. Complaints shall be in writing and shall contain such information and be in such form as the Secretary requires. Upon receipt of such a complaint the Secretary shall furnish a copy of the same to the person or persons who allegedly committed or are about to commit the alleged discriminatory housing practice. Within thirty days after receiving a complaint, or within thirty days after the expiration of any period of reference under subsection (c), the Secretary shall investigate the complaint and give notice in writing to the person aggrieved whether he intends to resolve it. If the Secretary decides to resolve the complaint, he shall proceed to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion. Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this title without the written consent of the persons concerned. Any employee of the Secretary who shall make public any information in violation of this provision shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $1,000 or imprisoned not more than one year.

"(b) A complaint under subsection (a) shall be filed within one hundred

that is, "[a]ny person who claims to have been injured by a discriminatory housing practice," may seek administrative relief from the Secretary of the Department of Housing and

and eighty days after the alleged discriminatory housing practice occurred. Complaints shall be in writing and shall state the facts upon which the allegations of a discriminatory housing practice are based. Complaints may be reasonably and fairly amended at any time. A respondent may file an answer to the complaint against him and with the leave of the Secretary, which shall be granted whenever it would be reasonable and fair to do so, may amend his answer at any time. Both complaints and answers shall be verified.

"(c) Wherever a State or local fair housing law provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title, the Secretary shall notify the appropriate State or local agency of any complaint filed under this title which appears to constitute a violation of such State or local fair housing law, and the Secretary shall take no further action with respect to such complaint if the appropriate State or local law enforement official has, within thirty days from the date the alleged offense has been brought to his attention, commenced proceedings in the matter, or, having done so, carries forward such proceedings with reasonable promptness. In no event shall the Secretary take further action unless he certifies that in his judgment, under the circumstances of the particular case, the protection of the rights of the parties or the interests of justice require such action.

"(d) If within thirty days after a complaint is filed with the Secretary or within thirty days after expiration of any period of reference under subsection (c), the Secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this title, insofar as such rights relate to the subject of the complaint: *Provided,* That no such civil action may be brought in any United States district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this title. Such actions may be brought without regard to the amount in controversy in any United States district court for the district in which the discriminatory housing practice is alleged to have occurred or be about to occur or

Urban Development and, if the Secretary cannot within 30 days resolve the dispute "by informal methods of conference, conciliation, and persuasion," may bring a civil action in federal district court. In *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972), we held that the broad definition given to the term "person aggrieved" in § 810 evinced " 'a congressional intention to define standing as broadly as is permitted by Article III of the Constitution.' " 409 U. S., at 209.

The second route into federal court under Title VIII— § 812 [2]—provides simply that "[t]he rights granted by sec-

---

in which the respondent resides or transacts business. If the court finds that a discriminatory housing practice has occurred or is about to occur, the court may, subject to the provisions of section 812 of this title, enjoin the respondent from engaging in such practice or order such affirmative action as may be appropriate.

"(e) In any proceeding brought pursuant to this section, the burden of proof shall be on the complainant.

"(f) Whenever an action filed by an individual, in either Federal or State court, pursuant to this section or section 812 of this title, shall come to trial the Secretary shall immediately terminate all efforts to obtain voluntary compliance." 82 Stat. 85, 42 U. S. C. § 3610.

[2] Section 812 provides:

"(a) The rights granted by sections 803, 804, 805, and 806 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court ' shall continue such civil case brought pursuant to this section or section 810 (d) of this title from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a

tions 803, 804, 805, and 806 of this title may be enforced by civil actions in appropriate United States district courts . . . ." 42 U. S. C. § 3612. Despite the absence from § 812 of the "person aggrieved" language so crucial to our holding in *Trafficante* regarding standing under § 810, the Court today holds that "[s]tanding under § 812, like that under § 810, is 'as broa[d] as is permitted by Article III of the Constitution.'" *Ante,* at 109, quoting *Trafficante* v. *Metropolitan Life Ins. Co., supra,* at 209. I think that the Court's decision ignores the plain language of § 812 and makes nonsense out of Title VIII's formerly sensible statutory enforcement scheme.

I

The doctrine of standing is comprised of both constitutional limitations on the jurisdiction of federal courts and prudential rules of self-restraint designed to bar from federal court those parties who are ill-suited to litigate the claims they assert. In its constitutional dimension, the standing inquiry asks whether the party before the court has " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify

---

complaint or civil action under the provisions of this Act shall not be affected.

"(b) Upon application by the plaintiff and in such circumstances as the court may deem just, a court of the United States in which a civil action under this section has been brought may appoint an attorney for the plaintiff and may authorize the commencement of a civil action upon proper showing without the payment of fees, costs, or security. A court of a State or subdivision thereof may do likewise to the extent not inconsistent with the law or procedures of the State or subdivision.

"(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees." 82 Stat. 88, 42 U. S. C. § 3612.

exercise of the court's remedial powers on his behalf." *Warth* v. *Seldin,* 422 U. S. 490, 498–499 (1975) (emphasis in original), quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). The crucial elements of standing are injury in fact and causation. To demonstrate the "personal stake" in the litigation necessary to satisfy the Constitution, the party must suffer "a distinct and palpable injury," *Warth* v. *Seldin, supra,* at 501, that bears a " 'fairly traceable' causal connection" to the challenged action. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 72 (1978), quoting *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 261 (1977). Accordingly, when an objection to a party's standing to litigate in federal court is constitutionally based, "the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 38 (1976).

A plaintiff who alleges sufficient injury to satisfy these minimum constitutional limitations on federal jurisdiction may nonetheless be barred from federal court under our prudential standing rules because he asserts a generalized grievance shared in substantially equal measure by all or a large class of citizens, *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208 (1974), or because he seeks to "rest his claim to relief on the legal rights or interests of third parties" rather than his own. *Warth* v. *Seldin,* 422 U. S., at 499. These prudential rules, however, are subject to modification by Congress, which may grant to any person satisfying Art. III's minimum standing requirements a right "to seek relief on the basis of the legal rights and interests of others, and, indeed, [to] invoke the general public interest in support of [his] claim." *Id.,* at 501. Congress did just that in enacting § 810 of Title VIII, which grants to "[a]ny person who claims to have been injured by a discriminatory housing practice" a right to seek federal administrative and judicial relief. In *Trafficante,*

*supra,* we held that the broad definition given "person aggrieved" in § 810 indicated a congressional intent to accord apartment dwellers, who had not themselves suffered discrimination, an actionable right to be free from the adverse consequences flowing to them from racially discriminatory rental practices directed at third parties.[3] Plaintiffs' alleged "loss of important benefits from interracial associations," 409 U. S., at 210, was sufficient to satisfy the injury-in-fact requirement of Art. III.

In the case now before us, respondents—the village of Bellwood, five of its residents, and one resident of a neighboring community—brought suit against petitioner real estate firms, alleging that the firms had violated both 42 U. S. C. § 1982 and § 804 of Title VIII by "steering" prospective homebuyers to different areas in and around Bellwood according to their race. Like plaintiffs in *Trafficante,* the individual respondents allege that petitioners' practice of racial steering has deprived them of "the social and professional benefits of living in an integrated society."[4] App. 6, 99. Respondent village of Bellwood alleges that it has been injured "by having [its] housing market . . . wrongfully and illegally

―――――――――

[3] Despite suggestions to the contrary by the Court, *ante,* at 101 n. 7, our decision in *Trafficante* was clearly not intended to construe § 812 as well as § 810. The opinion focuses exclusively on § 810, closing with the following statement:

"We can give vitality to § 810 (a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." 409 U. S., at 212.

The Court's passing reference in *Trafficante* to § 812 can hardly be construed as an interpretation of that provision.

[4] Alleging injury to "their right to select housing without regard to race," App. 6, 99, the individual respondents initially sought to establish standing in their capacity as "testers." Respondents have abandoned, in this Court, their claim of standing as testers, electing to stand or fall on their allegations of injury in their capacity as residents in and around Bellwood.

manipulated to the economic and social detriment of [its] citizens." *Ibid.* Unlike plaintiffs in *Trafficante,* however, respondents have not proceeded under § 810 of Title VIII, choosing instead to travel the direct route into federal court provided by § 812.

In pertinent part, § 812 provides:

> "The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction." 82 Stat. 88, 42 U. S. C. § 3612 (a).

The language of § 812 contains no indication that Congress intended to authorize the commencement of suits under Title VIII by persons who would otherwise be barred from federal court by prudential standing rules. Indeed, were § 812 the only method for enforcing Title VIII, respondents—who were not themselves discriminated against by petitioners—could hardly argue that they were statutorily authorized to seek relief on the basis of legal rights and interests of third parties who had been racially "steered" into and away from certain areas in the community. The Court, however, in effect reads the broadly defined "person aggrieved" language of § 810 into § 812, holding that the alternative routes into federal court provided under the sections are available to precisely the same class of plaintiffs. The language and structure of Title· VIII lead me to a contrary conclusion.

## II

The term "person aggrieved" is used throughout § 810—no less than four times—to denominate the proper § 810 claimant; [5] by contrast, in § 812 Congress wholly avoided use of this broadly defined term, preferring instead the familiar "plaintiff." Noting that § 812 is phrased in the passive voice,

---

[5] Indeed, the term is found nowhere else in Title VIII.

the Court concludes that the absence of the "person aggrieved" language from the provision "does not indicate that standing is more *limited* under that provision than under § 810." *Ante,* at 103 (emphasis added). The point of our decision in *Trafficante,* however, was that the presence of the "person aggrieved" language in § 810 demonstrated Congress' affirmative intent to abrogate prudential standing rules and to *expand* standing under the section to the full extent permitted by Art. III of the Constitution. It thus follows that the absence of "person aggrieved" from § 812 indicates that Congress did not intend to abrogate the normal prudential rules of standing with regard to § 812.

Consistent with § 810's broad grant of standing is the language chosen by Congress to define the scope of the civil action that may be brought under the section: "[T]he person aggrieved may . . . commence a civil action in any appropriate United States district court . . . to enforce the rights granted *or protected* by this title . . . ." 82 Stat. 86, 42 U. S. C. § 3610 (d) (emphasis added). Section 812, in contrast, authorizes the commencement of a civil action to enforce only "[t]he rights granted by," as opposed to "rights granted or protected by," §§ 803, 804, 805, and 806. Clearly, Congress contemplated that § 812 suits could be instituted only by persons alleging injury to rights expressly secured under the enumerated sections.

Section 804, the provision allegedly offended by petitioners, provides in pertinent part:

"[I]t shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or

in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

. . . . .

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." 82 Stat. 83, as amended, 88 Stat. 729, 42 U. S. C. § 3604.

In essence, § 804 grants to all persons [6] seeking housing the right not to be discriminated against on the basis of race, color, religion, sex, or national origin. Nowhere in the section are the individual respondents granted a right to reap the "social and professional benefits of living in an integrated society." Nor does § 804 grant the village of Bellwood an actionable right not to have its housing market "wrongfully and illegally manipulated." Accordingly, respondents have suffered no injury to "rights granted by [§ 804]."

The structure of both § 810 and § 812 and the significant differences between the two enforcement provisions further support the conclusion that Congress intended to restrict access to federal courts under § 812 to a more limited class of plaintiffs than that contemplated under § 810. A "person aggrieved" proceeding under § 810 must first file a complaint with the Secretary of Housing and Urban Development, who is authorized "to try to eliminate or correct the alleged discriminatory housing practice by informal methods of conference, conciliation, and persuasion." 42 U. S. C. § 3610 (a). The Secretary, however, must defer to the appropriate state

---

[6] "Person" is defined in Title VIII as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers, and fiduciaries." 42 U. S. C. § 3602 (d).

or local agency whenever state or local fair-housing laws provide rights and remedies substantially equivalent to those secured under Title VIII. The Secretary may recommence action on the complaint only upon certification that such action is necessary to protect the rights of the parties or the interests of justice. 42 U. S. C. § 3610 (c). If the Secretary's informal efforts prove futile, the "person aggrieved" may commence a civil action under Title VIII in federal district court, but only if he has no comparable judicial remedy under "substantially equivalent" state or local fair-housing legislation. 42 U. S. C. § 3610 (d).

The § 812 "plaintiff" is not similarly encumbered. He may proceed directly into federal court, deferring neither to the Secretary of Housing and Urban Development nor to state administrative and judicial processes. See 42 U. S. C. § 3612 (a). The District Court is authorized to appoint an attorney for the § 812 plaintiff and to waive payment of fees, costs, and security. 42 U. S. C. § 3612 (b). Additionally, broader relief is available under § 812. The "prevailing plaintiff" may be awarded a "permanent or temporary injunction, temporary restraining order, or other order, and . . . actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees . . . ." 42 U. S. C. § 3612 (c). Section 810, by contrast, makes no allowance for damages, costs, or counsel fees, limiting the victorious claimant to injunctive relief and such other affirmative action as may be appropriate. 42 U. S. C. § 3610 (d). Nor does § 812 contain a provision similar to § 810 (e), which provides that "[i]n any proceeding brought pursuant to [§ 810], the burden of proof shall be on the complainant." Given the advantages to the claimant of proceeding under § 812, it is hard to imagine why anyone would *voluntarily* proceed under § 810 if both routes were equally available.

When the carefully chosen language and the widely variant provisions of § 810 and § 812 are thus compared, the logic of

Title VIII's private enforcement mechanism becomes clear. Immediate access to federal judicial power under § 812 was reserved to those directly victimized by a discriminatory housing practice; that is, those actually discriminated against on the basis of race, color, religion, sex, or national origin. Only direct victims of housing discrimination were deemed to suffer injuries of sufficient magnitude to authorize appointment of counsel and recovery of compensatory and punitive damages, costs, and attorney fees. But because discrimination in housing can injure persons other than the direct objects of the discrimination, *Trafficante,* 409 U. S., at 210, Congress believed that the statute's fair-housing goals would be served by extending standing under § 810 as broadly as constitutionally permissible. Anyone claiming to have been injured by a discriminatory housing practice, even if not himself directly discriminated against, is authorized to seek redress under § 810. By barring indirect victims of housing discrimination from immediate access to federal court under § 812, and thus requiring them to exhaust federal conciliation procedures as well as viable state and local remedies pursuant to § 810, Congress sought to facilitate informal resolution of Title VIII disputes, to avoid federal judicial intervention when possible, and to encourage state and local involvement in the effort to eliminate housing discrimination.

The legislative history of Title VIII, while "not too helpful," *Trafficante, supra,* at 210, supports the view that standing to commence a civil action under § 812 is limited to direct victims of housing discrimination. Introduced on the Senate floor and approved unchanged by the House, Title VIII's legislative history must be culled primarily from the Congressional Record. The brief debate preceding adoption of Amendment No. 586, which amended § 810 to require exhaustion of "substantially equivalent" remedies under state or local fair-housing laws as a prerequisite to the filing of a Title

VIII action in federal court, is particularly enlightening. Senator Miller, who introduced the amendment, explained:

"I provide in the second part of my amendment that no civil action may be brought in any U. S. district court if the person aggrieved has a judicial remedy under a State or local fair housing law which provides substantially equivalent rights and remedies to this act.

"I believe it is a matter of letting the State and local courts have jurisdiction. We in the Senate know that our Federal district court calendars are crowded enough, without adding to that load if there is a good remedy under State law." 114 Cong. Rec. 4987 (1968).

Senator Hart added that the amendment "recognizes the desire all of us share that the State remedies, where adequate, be availed of and that unnecessary burdening litigation not further clog the court calendars." *Ibid.* It seems unlikely that Congress would wholly frustrate the concerns moving it to adopt § 810's exhaustion requirement by opening § 812's direct route into federal court to all "persons aggrieved."

The debate concerning the allowance of attorney's fees to prevailing plaintiffs under § 812 also indicates a congressional understanding that standing to proceed immediately into federal court under § 812 was limited to discriminatees. Senator Hart commented that §§ 812 (b) and (c)—which authorize the district court to waive payment of fees, costs, and security in appropriate cases and to award damages, court costs, and reasonable attorney fees to prevailing plaintiffs—"reveal a clear congressional intent to permit, and even encourage, litigation by those who cannot afford to redress *specific wrongs aimed at them because of the color of their skin.*" 114 Cong. Rec. 5514–5515 (1968) (emphasis added).

The meager legislative history marshaled by the Court provides at best thin support for its expansive interpretation of standing under § 812. References in the legislative history describing § 812 as an "addition[al]" and "alternative" reme-

dial provision to § 810, *ante*, at 106, and nn. 16, 17, and 18, are hardly dispositive: one need only read the two sections to conclude that they provide "alternative" enforcement mechanisms. That § 810 and § 812 are "alternative" remedial provisions does not, however, compel the conclusion that they are equally available to all potential Title VIII claimants. The only piece of legislative history arguably supporting the Court's interpretation of § 812 is the House Judiciary Committee staff's use of the term "aggrieved person" to refer to potential § 812 plaintiffs. *Ante*, at 107 n. 18. This single, fleeting reference in the legislative history hardly seems sufficient to overwhelm the contrary indications of congressional intent found elsewhere in Title VIII's legislative history and in the carefully worded and structured provisions of § 810 and § 812.

I think that *Trafficante* pushed standing to the limit in construing the "person aggrieved" language of § 810. I cannot join the Court in pressing the more narrowly confined language of § 812 to the same limit.

### III

Respondents also claim standing under 42 U. S. C. § 1982, which provides: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." Unlike Title VIII, "§ 1982 is not a comprehensive open housing law." *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 413 (1968). Enacted as part of the Civil Rights Act of 1866, the section bars all racial discrimination, both private and public, in the sale or rental of property. *Ibid.*

It is clear that respondents have suffered no injury to the only right secured under § 1982—the right to be free from racially motivated interference with property rights. Their claim of standing under § 1982 is thus conceptually indistinguishable from a similar claim rejected by this Court in

*Warth* v. *Seldin,* 422 U. S. 490 (1975). Plaintiffs in *Warth* brought a § 1982 action against the town of Penfield, N. Y., and members of its Zoning, Planning, and Town Boards, claiming that the town's zoning ordinance effectively excluded persons of minority racial and ethnic groups. One of the plaintiffs, a nonprofit corporation organized to alleviate the housing shortage for low- and moderate-income persons in and around Penfield, based its standing to challenge the zoning ordinance on the loss to its members residing in Penfield of the "benefits of living in a racially and ethnically integrated community." 422 U. S., at 512. This Court rejected plaintiff's claim of standing, distinguishing *Trafficante* on the ground that § 1982, unlike § 810 of Title VIII, does not give residents of certain communities an actionable right to be free from the adverse consequences of racially discriminatory practices directed at and immediately harmful to others. Thus, we held plaintiff's "attempt to raise putative rights of third parties," 422 U. S., at 514, barred by the prudential rules of standing.

Like plaintiffs in *Warth,* respondents claim that they have been injured by racially discriminatory acts practiced on others. Thus, their claim of standing under § 1982 must also fail.

Because I think that respondents have no standing to litigate claims under 42 U. S. C. § 1982 and § 812 of the Civil Rights Act of 1968, I would reverse the judgment of the Court of Appeals.