Mark WILSON and Anne
Walker, Plaintiffs,

v.

GLENWOOD INTERMOUNTAIN PROPERTIES, INC.; D. Roger and Bonnie L. Conrad; Branbury Park, Inc; Data–Prop Management, Inc.; David E. and Barbara K. Nagel; Kent S. and Lana R. Gilbert; Tapp/Sorensen Partnership; Elaine M. Miller; John E. Knudsen and Kelly W. Romney Partnership; and Glen C. Rowland, Defendants.

Brigham Young University, a Utah
corporation, Intervenor.

Civ. No. 94–C–745.

United States District Court,
D. Utah,
Central Division.

Feb. 1, 1995.

Jensie L. Anderson, American Civ. Liberties Union of Utah Foundation, Inc., Bruce Plenk, Utah Legal Services, Salt Lake City, UT, for plaintiffs.

Richard M. Hymas, Nielsen & Senior, Salt Lake City, UT, for defendants.

Mary Anne Q. Wood, Kathryn O. Balmforth, Wood, Spendlove & Quinn, L.L.C., Salt Lake City, UT, Eugene H. Bramhall, David B. Thomas, Brigham Young University, Provo, UT, for intervenor.

## MEMORANDUM DECISION AND ORDER GRANTING & DENYING CROSS–MOTIONS FOR SUMMARY JUDGMENT

WINDER, Chief Judge.

This matter is before the court on three related motions for summary judgment: (1) a motion for summary judgment filed by plaintiffs Mark Wilson and Anne Walker ("Plaintiffs"); (2) a motion for summary judgment filed by defendants Glenwood Intermountain Properties, Inc., D. Roger and Bonnie L. Conrad, Branbury Park, Inc., Data–Prop Management, Inc., David E. and Barbara K. Nagel, Kent S. and Lana R. Gilbert, Tapp/Sorensen Partnership, Elaine M. Miller, John E. Knudsen and Kelly W. Romney Partnership, and Glen C. Rowland (collectively referred to as "Defendants" or "Defendant Landlords"); and (3) a motion for summary judgment filed by Intervenor Brigham Young University ("Intervenor" or "BYU").

The court held a hearing on all three motions on January 18, 1995 at 8:00 a.m. At the hearing, Mr. Bruce Plenk on behalf of the American Civil Liberties Union represented the Plaintiffs, Mr. Richard M. Hymas represented the Defendant Landlords, and Ms. Mary Anne Q. Wood and Mr. David B. Thomas represented Intervenor BYU.

Before the hearing, the court considered carefully the memoranda and other materials submitted by each of the parties relating to the three motions. The court had also read certain of the authorities cited by each of the parties. Following oral argument, and after taking all three motions under advisement, the court has further considered the law and facts related to each motion. Having now fully considered the issues in this case, and good cause appearing, the court enters the following Memorandum Decision and Order.

## I. BACKGROUND

### (A). The Parties.

Plaintiff Mark Wilson ("Wilson") is a twenty-year old unmarried male who resides in Utah County, State of Utah. Plaintiff Anne Walker ("Walker") is an eighteen-year old unmarried female who also resides in Utah County, State of Utah. Neither Wilson nor Walker has any children. Together, they make up the plaintiffs in this case.

Defendant Glenwood Intermountain Properties, Inc. ("Glenwood") is a for-profit Utah corporation which manages the Glenwood, Raintree, and Riviera apartment complexes. Defendants D. Roger and Bonnie L. Conrad ("the Conrads") are individuals who own and manage the University Park apartment complex. Defendant Branbury Park, Inc. ("Branbury") is a for-profit Utah corporation which owns and manages the Branbury Park apartment complex. Defendant Data–Prop Management, Inc. ("Data–Prop") is a for-profit Utah corporation which manages the Manavu and Courtside condominium complexes. Defendants David E. and Barbara K. Nagel ("the Nagels") are individuals who own and manage the Belmont apartment complex. Defendants Kent S. and Lana R. Gilbert ("the Gilberts") are individuals who own and manage the Windfield apartment

complex. Defendant Tapp/Sorensen Partnership ("Tapp/Sorensen") is a for-profit partnership which owns and manages the Berkshire apartment complex. Defendant Elaine M. Miller ("Miller") is an individual who owns and manages the Miller apartment complex. Defendant John E. Knudsen & Kelly W. Romney Partnership ("Knudsen/Romney") is a for-profit partnership which owns and manages the Banbridge Square apartment complex. Defendant Glen C. Rowland ("Rowland") is an individual who owns and manages the Campus Plaza apartment complex. Together, Glenwood, the Conrads, Branbury, Data–Prop, the Nagels, the Gilberts, Tapp/Sorensen, Miller, Knudsen/Romney, and Rowland make up the defendants in this case. All of these defendants either own or operate for-profit apartment complexes located in the Provo, Utah area.

Finally, Intervenor BYU is a non-profit institution of higher education that is located in Provo, Utah. BYU is sponsored by the Church of Jesus Christ of Latter-day Saints ("the Mormon Church") and some 99% of its students are of the Mormon faith. Despite the high percentage of Mormons who attend BYU, however, admission to BYU is not conditioned on either religion, race, sex, national origin, or disability.[1]

### (B). BYU's Off–Campus Housing Policy.

For over forty years, BYU has operated an off-campus housing program for its single students. As part of that program, all single BYU students between the ages of 18 and 25 are required, as a matter of admission, to either live on campus or in BYU-approved off-campus housing.[2] Moreover, BYU contracts with private landlords—including the Defendant Landlords in this action—to provide approved off-campus housing to its students.[3]

In order to become certified to provide off-campus housing to BYU students, all private landlords must promise to abide by BYU's off-campus housing policy.[4] Under that policy, the landlords must: (1) rent their BYU-approved facilities only to single BYU students, married students, or student families; (2) separate students from non-students by buildings or wings of buildings if the landlords decide to rent to both students and non-students; (3) rent only to single male or single female students or separate single male students from single female students by buildings or wings of buildings if the landlords decide to rent to both male and female BYU students; and (4) use the most recent version of the BYU-approved Student–Landlord Rental Agreement with all of their student renters.[5]

### (C). The Defendants' Current Rental Practices and Their Refusal to Rent to the Plaintiffs in this Case.

### (1). The Defendants' Rental Practices.

All of the apartment complexes owned and/or managed by the Defendant Landlords in this case have been certified by BYU to

---

1. BYU does require all of its students, regardless of their religious preference, to sign the BYU Honor Code prior to their admission to BYU. The BYU Honor Code provides, in pertinent part:

 As a matter of personal commitment, students, staff, and faculty of Brigham Young University are expected to demonstrate in daily living those moral virtues encompassed in the gospel of Jesus Christ, and will
 Be honest
 Live a chaste and virtuous life
 Obey the law
 Use clean language
 Respect others
 Abstain from alcoholic beverages, tobacco, tea, coffee, and drug abuse

 See Exhibit B to BYU's Mem. in Supp. of Mot. for Summ.J. at 5.

2. Married BYU students and students with families may, but are not required to, live in BYU-approved housing.

3. BYU-approved off-campus housing is generally located in multi-unit apartment complexes which contain rental units that have space for from two to six people. Living space in each unit is then rented by the bed, with other areas (living room, kitchen, bathroom) shared in common.

4. If a private landlord refuses to abide by BYU's off-campus housing policy, he or she may not rent to any single BYU students.

5. In 1992, a total of 22,886 rental units were available in the Provo, Orem, and Springville, Utah area. Of that number, BYU certified 4,085 rental units—or 18% of all units available—as appropriate for BYU-approved student housing.

provide BYU-approved off-campus student housing. Moreover, and in accordance with their agreement to abide by BYU's off-campus housing policy, the Defendant Landlords rent units within their apartment complexes as follows: (1) the Riviera, University Park, Manavu, Courtside, Belmont, Windfield, Berkshire, Miller, Banbridge Square, and Campus Plaza apartments rent apartment units only to BYU students; (2) the Riviera, Belmont, Miller, and Campus Plaza apartments rent apartment units to both single male and single female BYU students. The male and female students are then segregated from each other by buildings or wings of buildings;[6] (3) the University Park, Manavu, and Windfield apartments rent apartment units only to single male BYU students or to married BYU students with or without children; (4) the Courtside, Berkshire, and Banbridge Square apartments rent apartment units only to single female BYU students or to married BYU students with or without children; and (5) the Glenwood, Raintree, and Branbury Park apartments rent apartment units to male BYU students, female BYU students, and to non-students. All single BYU students are then segregated from non-students by buildings or wings of buildings, with the single male BYU students further segregated from the single female BYU students by other buildings or wings of buildings.[7]

### (2). The Defendants' Advertising Practices.

The apartment complexes owned and/or managed by the Defendant Landlords in this case also advertise their rental practices to both BYU students and to the general public. For example, the Manavu, Windfield, and University Park apartments all either now advertise or have in the past advertised that their apartment units are available to male BYU students only. Similarly, the Courtside, Berkshire, and Banbridge Square apartments all either now advertise or have in the past advertised that their apartment units are available to female BYU students only.[8]

### (3). The Plaintiffs' Efforts to Rent from the Defendants.

From May through July, 1994, plaintiff Wilson applied to rent an apartment at the Riviera, Manavu, Courtside, Windfield, Berkshire, Miller, Banbridge Square, and Campus Plaza apartments. All eight of these apartment complexes refused to rent to Wilson because he was not a BYU student. Additionally, the Courtside, Berkshire, and Banbridge Square apartments also refused to rent to Wilson because he is male and they rent only to female BYU students.

During this same time period, plaintiff Walker applied to rent an apartment at the Manavu, Windfield, and University Park apartments. All three of these apartment complexes refused to rent to Walker because she is female and they rent only to male BYU students.

Finally, in July, 1994, plaintiff Wilson contacted the Riviera and Courtside apartments and told them he was a single parent wishing to rent an apartment unit at their complex. Wilson claims he was told by the managers of those apartments that neither the Riviera nor the Courtside apartments rent apart-

---

**6.** The Riviera, Belmont, Miller, and Campus Plaza apartments also rent or will rent an entire apartment to married student couples with or without children, and to single students with children.

**7.** In addition, all of the apartment complexes noted above will rent to either an individual or a couple with children provided that (a) an entire apartment unit is available for rent, (b) the individual or couple is otherwise qualified to rent an available apartment under BYU's housing policy, (3) the individual or couple desires to rent an entire apartment, as opposed to merely a portion of an apartment or bed space within an apartment, and (4) the individual or couple pays the

full rental price for an apartment unit. For reasons of personal modesty and privacy, the apartment complexes do not allow either couples or single individuals with children to rent bed space within an apartment unit occupied by other tenants.

**8.** The signs currently in place at the Manavu, Windfield, University Park, and Banbridge Square apartments make no reference as to the gender of those who may rent space therein. Nonetheless, it is undisputed that at the time that this lawsuit arose all four of those apartments had signs which stated otherwise.

ment units to individuals with children.[9]

### (D). The Gist of the Plaintiffs' Fair Housing Act Claims.

In August of 1994, the Plaintiffs filed with the court their Third Amended Complaint ("complaint"). In substance, the Plaintiffs' complaint alleges five causes of action against the Defendant Landlords, all arising out of the Defendant Landlords' alleged violation of the federal Fair Housing Act.[10] Those causes of action are as follows: (1) the Plaintiffs' first cause of action alleges that defendants Glenwood, Data–Prop, the Gilberts, Tapp/Sorensen, Miller, Knudsen/Romney, and Rowland all refused to rent to them because they were non-students in violation of the religious discrimination provisions of 42 U.S.C.A. § 3604(a); (2) the Plaintiffs' second cause of action alleges that defendants Data–Prop, the Conrads, the Gilberts, Tapp/Sorensen, and Knudsen/Romney all refused to rent to them because of their gender in violation of the gender discrimination provisions of 42 U.S.C.A. § 3604(a); the Plaintiffs' third cause of action alleges that defendants Glenwood and Data–Prop refused to rent to them because of their familial status in violation of the familial status provisions of 42 U.S.C.A. § 3604(a); the Plaintiffs' fourth cause of action alleges that all of the Defendant Landlords segregate their tenants based on either gender or on student status in violation of the terms, conditions, and privileges provisions of 42 U.S.C.A. § 3604(b) & (d); and (5) the Plaintiffs' fifth cause of action alleges that all of the Defendant Landlords either now publish or have in the past published advertising which indicates a preference, limitation, or discrimination based on gender, familial status, or religion in violation of the discriminatory advertising provisions of 42 U.S.C.A. § 3604(c). See Pls.' Third Am.Compl. at ¶¶ 42–60.[11]

On October 3, 1994, Intervenor BYU filed a motion for summary judgment asking the court to hold that the Plaintiffs are not entitled to recover on any of their Fair Housing Act claims as a matter of law. This was followed on October 27, 1994 by the Defendant Landlords' motion for summary judgment in which the Defendant Landlords also asked the court to hold that the Plaintiffs are not entitled to recover on any of their Fair Housing Act claims as a matter of law. Finally, on November 30, 1994, the Plaintiffs filed a motion for summary judgment in which they asked the court to hold that the Defendant Landlords have violated the provisions of the Fair Housing Act as a matter of law.

### II. STANDARD OF REVIEW

All of the parties in this case have filed motions for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

Once the moving party has carried its burden, Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by … affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

---

**9.** Both defendants Glenwood and Data–Prop, the owners and/or managers of the Riviera and Courtside apartments, dispute this fact. Nonetheless, given the court's treatment of the Plaintiffs' familial status claim *infra*, this factual dispute is irrelevant.

**10.** The Fair Housing Act is the common name for Title VIII of the Civil Rights Act of 1968. It is currently codified as amended at 42 U.S.C.A. §§ 3601–31 (West 1977 & Supp.1994).

**11.** The Plaintiffs' complaint does not seek monetary damages from the Defendants for their alleged violations of the Fair Housing Act. Instead, the Plaintiffs' complaint asks for injunctive relief enjoining the Defendants from engaging in any future conduct which violates the Fair Housing Act. See Pls.' Third Am.Compl. at ¶¶ 61–71.

genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991).[12] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir.), *cert. denied,* 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[13] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

### III. *DISCUSSION*

The court notes at the outset that this case is not about the propriety of BYU's off-campus student housing program. Indeed, this case is not even about whether BYU's off-campus student housing program is socially acceptable in all instances. The *sole* issue for this court to decide is whether BYU's off-campus student housing program, as applied and carried out by the Defendant Landlords in this case, violates the statutory prohibitions of the Fair Housing Act. With

that in mind, the court turns to a discussion of the Plaintiffs' Fair Housing Act claims on their merits.

### *(A). The Plaintiffs' Familial Status Discrimination Claim.*

The Plaintiffs' third cause of action alleges that defendants Glenwood and Data–Prop refused to rent to them because of their familial status. If this allegation were found on the merits to be true, the Fair Housing Act would clearly be violated. *See* 42 U.S.C.A. § 3604(a) (West Supp.1994) (making it unlawful to "refuse to sell or rent ... a dwelling to any person because of ... familial status"). It appears, however, that the Plaintiffs lack standing to even bring this claim.[14]

Standing under the Fair Housing Act extends "'to the full limits of Art. III.'" *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120–21, 71 L.Ed.2d 214 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979)); *Housing Auth. of the Kaw Tribe of Indians v. City of Ponca City,* 952 F.2d 1183, 1193 (10th Cir.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). "Courts thus lack authority to erect prudential barriers to restrict the standing of plaintiffs bringing suit under the [Fair Housing Act] beyond the constitutional parameters erected by Article III." *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1497 (10th Cir.1995) (citing *Havens,* 455 U.S. at 372, 102 S.Ct. at 1120–21).[15]

---

12. The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(e), except the mere pleadings themselves." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

13. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

14. Because Plaintiffs lack standing to bring their familial discrimination claim, the court is of course precluded from addressing that claim on the merits. *See Alexander v. Anheuser–Busch Cos., Inc.,* 990 F.2d 536, 538 (10th Cir.1993) (recognizing that standing involves a constitutional limitation on a federal court's jurisdiction).

15. Federal courts have traditionally divided the standing doctrine into a two-tiered framework composed of (1) the minimum constitutional requirements for cases and controversies and (2) prudential considerations that limit the exercise of jurisdiction in certain actions. *See E.F. Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 984 (11th Cir.1990). Congress, however, has expanded standing in the Fair Housing Act context to the fullest extent permitted by Article III. *See Havens,* 455 U.S. at 372, 102 S.Ct. at 1120–21. This is why the erection of prudential barriers in Fair Housing Act cases is forbidden. *See Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1537 (11th Cir.1994).

■ For a plaintiff to have standing under Article III, three minimum constitutional requirements must exist: (1) the plaintiff must suffer an actual or threatened injury; (2) the plaintiff's injury must be traceable to the alleged unlawful conduct of the defendant; and (3) the relief the plaintiff seeks must be likely to remedy the plaintiff's injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Bangerter*, 46 F.3d at 1497.

■ In this case, the Plaintiffs allege that the Defendant Landlords refuse to rent to individuals with children. The Plaintiffs have not alleged, however, that they have any children of their own. Nor have they alleged that they have been injured as a result of the Defendant Landlords' refusal to rent to third-parties with children. They have thus failed to show that they were injured as "members of a racial minority or other protected class," the protection of whom the Fair Housing Act was clearly designed. *See Darby v. Heather Ridge*, 806 F.Supp. 170, 176 (E.D.Mich.1992). The Plaintiffs thus lack standing to bring their familial status discrimination claim against the Defendants.[16]

The Plaintiffs also lack "tester" standing to bring their familial status discrimination claim against the Defendants. The Supreme Court has validated the doctrine of tester standing. *Havens*, 455 U.S. at 373, 102 S.Ct. at 1121. Nonetheless, the law is clear that testers,[17] like any other plaintiffs, must allege an actual or threatened injury to acquire standing under the Fair Housing Act. *See id.* at 375, 102 S.Ct. at 1122 ("[T]he injury underlying tester standing ... is a direct one."); *Nur v. Blake Dev. Corp.*, 655 F.Supp. 158, 162 (N.D.Ind.1987) ("Tester standing is

based on a direct injury to a statutory right."). In this case, and as noted above, the Plaintiffs have not alleged that they have children or that they have been injured as a result of the Defendant Landlords' refusal to rent to third-parties with children. They have thus not shown that they have been " 'genuinely injured by conduct that violates *someone's* ... rights' under the [Fair Housing Act]." *Fair Employment Council v. BMC Mkt. Corp.*, 28 F.3d 1268, 1278 (D.C.Cir.1994) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979)). Accordingly, because the Plaintiffs have not shown that they have been "genuinely injured" by the Defendant Landlords' conduct in this case, they lack standing as "testers" to bring their familial status discrimination claim.

*(B). The Plaintiffs' Religious Discrimination Claim.*

The Plaintiffs' first cause of action alleges that defendants Glenwood, Data–Prop, the Gilberts, Tapp/Sorensen, Miller, Knudsen/Romney, and Rowland all refused to rent to them because they were non-students in violation of the religious discrimination provisions of 42 U.S.C.A. § 3604(a). Section 3604(a) clearly prohibits religious discrimination in the sale or rental of public housing. *See* 42 U.S.C.A. § 3604(a) (West Supp.1994) (making it unlawful to "refuse to sell or rent ... a dwelling to any person because of ... religion"). The questions to be decided by the court, however, are whether (1) the Plaintiffs have standing to bring a religious discrimination claim against the Defendant Landlords and (2) if they do have standing, whether the Plaintiffs are entitled to recover on that claim.

---

**16.** The Fair Housing Act defines "familial status" as:

> [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with—
> (1) a parent or another person having legal custody of such individual or individuals; or
> (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

42 U.S.C.A. § 3602(k) (West Supp.1994). Given this definition, in order to be protected by section

3604(a)'s prohibition against familial status discrimination, one must be the parent or legal guardian of a child under the age of eighteen and share a common domicile with that child.

**17.** " '[T]esters' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters for the purpose of collecting evidence of unlawful [housing] practices." *Havens*, 455 U.S. at 373, 102 S.Ct. at 1121.

*(1). The Standing Issue.*

As noted above, all plaintiffs, whether testers or not, must show that they have suffered an actual or threatened injury to have standing under the Fair Housing Act. *See Lujan,* 504 U.S. at ——, 112 S.Ct. at 2136; *Havens,* 455 U.S. at 375, 102 S.Ct. at 1122; *Nur,* 655 F.Supp. at 162.

█ In this case, the Plaintiffs' religious discrimination claim is premised on the argument that the Defendant Landlords segregate Mormons from non-Mormons.[18] The Plaintiffs, however, have failed to assert that they themselves are non-Mormons, or even that the segregation of Mormons from non-Mormons somehow interferes with the Plaintiffs' religious rights. The Plaintiffs therefore have failed to show how they "personally [have] suffered some actual or threatened injury as a result of the [religious discrimination practiced by the Defendant Landlords]." *Gladstone, Realtors,* 441 U.S. at 99, 99 S.Ct. at 1608. The Plaintiffs thus lack standing to bring their religious discrimination claim.[19]

*(2). The Substance of Plaintiffs' Religious Discrimination Claim.*

A housing practice violates the Fair Housing Act if (1) it is motivated by a discriminatory purpose (a "disparate treatment" case) or (2) it has a disproportionate adverse impact upon a protected class (a "disparate impact" case). *See Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986 (4th Cir.1984). As shown below, even if the Plaintiffs did have standing to bring their religious discrimination claim against the Defendant Landlords, they would not be entitled to relief on that claim under either of the two theories noted above.

█ *a. The Plaintiffs cannot recover under a disparate treatment theory.* The

three-part burden of proof analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII employment discrimination case, is also the proper analysis to use in evaluating disparate treatment cases brought under the Fair Housing Act. *See Asbury v. Brougham,* 866 F.2d 1276, 1279 (10th Cir.1989). Under the *McDonnell Douglas* analysis, the plaintiff must first come forward with proof of a prima facie case of discrimination. *Id.* Second, if the plaintiff establishes her prima facie case, the burden shifts to the defendant to prove that his refusal to rent was motivated by legitimate, non-discriminatory reasons. *Id.* Finally, once the defendant by evidence articulates non-discriminatory reasons for his conduct, the burden shifts back to the plaintiff to prove that the proffered reasons were pretextual. *Id.*

█ Given this analysis, it is clear to the court that the Plaintiffs cannot prevail on their disparate treatment theory as a matter of law. First, the Plaintiffs cannot make out a prima facie case of intentional discrimination. To establish a prima facie case of intentional discrimination under the Fair Housing Act, a plaintiff must prove that: (1) she is a member of a statutorily protected class; (2) she applied for and was qualified to rent an apartment at the complex in question; (3) she was denied the opportunity to rent an apartment; and (4) a housing opportunity remained available. *See* 42 U.S.C.A. § 3604(a); *Asbury,* 866 F.2d at 1279–80 (citations omitted); *Frazier v. Rominger,* 27 F.3d 828, 831 (2d Cir.1994). In this case, the Plaintiffs have not alleged either that they are non-Mormons or that they have been discriminated against because of their religious practices and beliefs. Indeed, the Plaintiffs have not even alleged that the De-

---

**18.** The Plaintiffs claim that by renting only to BYU students, the Defendant Landlords are in effect renting only to Mormons because a very large percentage of BYU students are of the Mormon faith. The Plaintiffs thus claim that the Defendant Landlords are using student/non-student status as a pretext for religious discrimination.

**19.** As the Supreme Court noted in *Lujan:*

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) *concrete and particularized,* and (b) *"actual or imminent, not 'conjectural or hypothetical.'"*

*Lujan,* 504 U.S. at ——, 112 S.Ct. at 2136 (emphasis added) (citations omitted).

fendant Landlords knew anything about their religious beliefs. Plaintiffs have thus not proven that they are members of a statutorily protected class (*i.e.,* non-Mormons) and they therefore cannot make out a prima facie case of religious discrimination as a matter of law.

■ Second, even if the Plaintiffs could make out a prima facie case of religious discrimination, they would still not be entitled to relief because the Defendant· Landlords clearly had legitimate, non-discriminatory reasons for not renting to them. As the facts of this case make clear, BYU's housing policy requires that the Defendant Landlords segregate BYU students from non-students in order to qualify as providers of BYU-approved off-campus student housing. Given this requirement, the Defendant Landlords' refusal to rent space to the non-student Plaintiffs in apartments they had reserved for students was based on the Defendant Landlords' legitimate, non-discriminatory desire to remain certified as providing BYU-approved student housing.[20] Thus, even if the Plaintiffs could make out a prima facie case of intentional discrimination, their religious discrimination claim would still fail since the Defendant Landlords have a legitimate, non-discriminatory reason for that discrimination.[21]

■ *b. The Plaintiffs cannot recover under a disparate impact theory.* In order to establish a prima facie case of disparate impact discrimination under the Fair Housing Act, a plaintiff must prove that: (1) she is a member of a protected class under the Act; and (2) a given rental policy has a disparate impact on her as a member of that class.

*See Betsey,* 736 F.2d at 987. If she is able to establish her prima facie case, the burden shifts to the defendant to show the existence of a business necessity which is sufficiently compelling to justify the challenged practice. *Id.* at 988.

■ Given this test, it is also clear to the court that the Plaintiffs cannot prevail on their disparate impact theory. First, as noted above, the Plaintiffs have not alleged that they are non-Mormons, or that they have been discriminated against on the basis of their religious beliefs. The Plaintiffs have thus failed to establish that they are members of a protected class for purposes of their religious discrimination claim. They therefore cannot make out a prima facie case of disparate impact religious discrimination as a matter of law. *See id.* at 987.

■ Second, even if the Plaintiffs could make out a prima facie case of disparate impact religious discrimination; they still could not prevail in this case because the Defendant Landlords' segregation of students from non-students is justified by compelling business necessity. In *Williams v. Colorado Springs, Colorado, School District No. 11,* 641 F.2d 835 (10th Cir.1981), a race discrimination case brought under Title VII, the Tenth Circuit held that business necessity may be established by proving that the alleged discriminatory practice has a " 'manifest relationship' " to the defendant's business. *Id.* at 840 (quoting *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977)). The *Williams* court went on to state as follows:

"[T]he business purpose must be sufficiently compelling to override any [religious]

---

20. The court notes that the Fair Housing Act only prohibits discrimination on the basis of race, color, religion, sex, familial status, or national origin. *See* 42 U.S.C.A. § 3604(a)–(b) (West 1977 & Supp.1994). It does not prohibit rental practices which discriminate against statuses not protected by the Act—including a person's status as a student or non-student. *See Lee v. Minnock,* 417 F.Supp. 436, 439 (W.D.Pa.1976), *aff'd,* 556 F.2d 567 (3d Cir.1977) (noting the "Fair Housing Act does not include in its proscription discrimination upon the basis of occupation").

21. Indeed, the fundamental problem with the Plaintiffs' religious discrimination claim is that the Defendant Landlords do not discriminate based on religion at all. For example, the Defendant Landlords rent their BYU-approved student housing to students only, regardless of whether the students are or are not Mormons. The Defendant Landlords do not rent their BYU-approved student housing to non-students, regardless of whether the non-students are or are not Mormons. Therefore, the court fails to see how the Defendant Landlords are discriminating based on religion in this case when non-Mormon students are allowed to rent space in student apartments while Mormon non-students are not.

impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential impact."

*Id.* at 841 (quoting *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)).

Thus, given *Williams,* in order to qualify for the business necessity defense here the Defendant Landlords must prove that there is a "manifest relationship" between their segregation of students from non-students and the business purpose that that segregation is designed to serve.[22] The Defendant Landlords have met this burden by presenting to the court the following undisputed evidence: (1) BYU's housing policy requires the segregation of students from non-students; (2) the Defendant Landlords must comply with that policy in order to obtain BYU-approved student housing status; (3) without that approval, the Defendant Landlords would not be able to rent to BYU students; (4) if the Defendant Landlords could not rent to BYU students, the occupancy rate at their apartment complexes would decrease dramatically due to the lack of demand for housing by non-students in the Provo, Utah area;[23] and (5) the drop in occupancy would result in a corresponding decrease in income to the Defendant Landlords, thus forcing many if not all of them out of business. In the court's opinion, this evidence establishes that the Defendant Landlords segregate students from non-students out of a "manifest need" to stay in business and that that reason is "sufficiently compelling to override any [religious] impact" that their "student segregation" policy has on the Plaintiffs. *Id.* Moreover, the Plaintiffs have presented to the court no evidence that other acceptable alternative policies exist which would accomplish the Defendant Landlords' business practice equally as well as the current practice. *Id.* The Defendant Landlords have therefore satisfied the legal requirements for the business necessity defense.[24]

### (C). The Plaintiffs' Gender Discrimination Claim.

The Plaintiffs' second cause of action alleges that defendants Data–Prop, the Conrads, the Gilberts, Tapp–Sorensen, and Knudsen–Romney all refused to rent to them because of their gender. The Fair Housing Act clearly prohibits gender discrimination in the sale or rental of public housing. *See* 42 U.S.C.A. § 3604(a) (West Supp.1994) (making it unlawful to "refuse to sell or rent ... a dwelling to any person because of ... sex"). Thus, the Act on its face would seem to prohibit the segregation of students by gender as practiced by the Defendant Landlords here. *See, e.g., Baumgardner v. Secretary of HUD on Behalf of Holley,* 960 F.2d 572, 579 (6th Cir.1992). Nonetheless, for the reasons noted below, the Plaintiffs are precluded from recovering on their gender discrimination claim in this case as a matter of law.[25]

**22.** The Plaintiffs argue that, pursuant to *Muller v. U.S. Steel Corp.,* 509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), the only way to establish business necessity is to show that a discriminatory practice is "essential to the safety and efficiency" of a business. The simple rejoinder to that argument is that in *Williams,* a case decided after *Muller,* the Tenth Circuit made clear that in cases where safety and efficiency are not relevant concerns (as in this case), the "manifest relationship" standard may be used. *See Williams,* 641 F.2d at 840–41 & n. 2.

**23.** The current occupancy rates at the Defendant Landlords' apartment complexes range from 70% to 100%. Those rates would fall to between 15% to 60% if the Defendant Landlords could no longer rent to BYU students.

**24.** While not pertinent to the court's decision, the court also notes that while Title IX of the Civil Rights Act grants the Defendant Landlords the right to segregate BYU students based on gender, *see* discussion *infra,* the Defendant Landlords are also specifically forbidden from applying that policy to non-students. *See* 20 U.S.C.A. § 1686; Utah Code Ann. § 57–21–3(7) (1994). This fact provides another non-discriminatory reason for why the Defendant Landlords have chosen to separate students from non-students at their apartments.

**25.** Both BYU and the Defendant Landlords concede that Plaintiffs have standing to bring their gender discrimination claim and the court agrees. The court will thus limit its discussion of this issue to the merits.

*(1). The Plaintiffs Have Not Alleged a Prima Facie Case of Gender Discrimination.*

As noted above, a plaintiff must establish a prima facie case in order to recover under the Fair Housing Act. *Asbury*, 866 F.2d at 1279. Accordingly, in order to establish their prima facie case of gender discrimination here, the Plaintiffs would have to show that: (1) they are members of a protected class; (2) they applied for and were otherwise qualified to rent space in the student apartments in which the Defendant Landlords segregate tenants by sex; (3) they were denied an opportunity to rent at the Defendant Landlords' apartments; and (4) a housing opportunity remained available at the Defendant Landlords' apartments. *Id.* at 1279–80.

 In this case, the Plaintiffs admit that they were not BYU students when they contacted the Defendant Landlords about renting a space in BYU-approved student-housing. Given this fact, the Plaintiffs clearly were not "otherwise qualified" to rent space at the sex-segregated apartments in question. The Plaintiffs thus cannot establish a prima facie case of gender discrimination in this case as a matter of law.[26]

*(2). The Relevance of Title IX to the Defendant Landlords' Rental Practices.*

 Moreover, even if the Plaintiffs could make out a prima facie case of gender discrimination, they still would not be entitled to recover in this case because Title IX of the Civil Rights Act expressly sanctions the segregation of college students by gender—which is the very conduct that the Plaintiffs complain about here.

Title IX was enacted for the purpose of prohibiting gender discrimination in all educational programs or activities which receive federal financial assistance. *See* 20 U.S.C.A. § 1681(a) (West 1990).[27] Nonetheless, Title IX provides that no violation occurs if educational institutions such as BYU segregate their students by gender in student apartments or dorms. *Id.* § 1686 ("[N]othing contained herein shall be construed to prohibit any educational institution receiving funds under this Act . . . from maintaining separate living facilities for the different sexes."). Moreover, the implementing regulations to Title IX also clarify that educational institutions such as BYU may segregate their students by gender in *both* on- and off-campus student housing. For example, 45 C.F.R. § 86.32 provides that educational institutions "may provide separate housing on the basis of sex" provided that they do not apply "different rules or regulations" related to that housing. *See* 45 C.F.R. § 86.32(a)–(b) (1993). Similarly, that same regulation also provides that sex-segregated housing may be provided "through solicitation, listing, *approval of housing,* or otherwise." *Id.* § 86.32(c)(2) (emphasis added).[28]

Given these clear statutory and regulatory directives, the court would be remiss if it were to find that the Defendant Landlords have violated the Fair Housing Act in this case merely because they segregate students who live in their apartments by gender. First of all, such a reading of the Fair Housing Act would render Title IX a nullity by forbidding conduct which Title IX expressly

---

**26.** The court wishes to emphasize that the Defendant Landlords' practice of segregating males from females by buildings or wings of buildings applies only to students. Thus, if the Defendant Landlords rent space to non-students (as many apparently do), they put the non-students in another area and do not segregate in that area by gender at all.

**27.** Section 1681(a) provides, in relevant part:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

**28.** Section 86.32(c)(2) provides in full:

A recipient which, through solicitation, listing, approval of housing, or otherwise, assists any agency, organization, or person in making housing available to any of its students, shall take such reasonable action as may be necessary to assure itself that such housing as is provided to students of one sex, when compared to that provided to students of the other sex, is as a whole: (i) Proportionate in quantity and (ii) comparable in quality and cost to the student. A recipient may render such assistance to any agency, organization, or person which provides all or part of such housing to students only of one sex.

authorizes.[29] Yet it is a fundamental of statutory construction that two apparently contradictory statutes should be construed in a manner which is consistent and gives effect to both. *See, e.g., Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 370, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986) ("In interpreting ... we are guided by the familiar rule of construction that ... provisions should be read so as not to create a conflict."); *FDIC v. Bates,* 838 F.Supp. 1216, 1219 (N.D.Ohio 1993), *aff'd in part and remanded,* 42 F.3d 369 (1994) ("A statute should be construed to avoid inconsistencies among its parts."). Thus, the court must read the Fair Housing Act's gender discrimination bar as not applying to conduct which, as here, is specifically authorized by Title IX.

Second, if this court were to find that the Fair Housing Act prohibits the gender segregation engaged in by the Defendant Landlords here, the court would be forced to disagree with the interpretation given to both the Fair Housing Act and Title IX by the very same federal agencies who are charged with enforcing those statutes. For example, in 1978 the United States Department of Justice thoroughly reviewed BYU's off-campus housing policy in response to a complaint that that policy violated the Fair Housing Act's prohibition against gender discrimination. The Department of Justice resolved the complaint without litigation, and entered into an agreement with BYU ("the 1978 Agreement") which spelled out BYU's obligations under both the Fair Housing Act and Title IX. The relevant provision in the 1978 Agreement provides:

> (a) *BYU is not precluded from requiring its single students residing off-campus to live in sex segregated housing,* provided such housing is exclusive to single students as hereafter defined; and

(b) the law precludes landlords renting to the general public from reserving apartment complexes or wings of complexes to persons of one sex, since such an arrangement results in the denial of apartments to prospective tenants because of sex.

*See* Agreement to Resolve Dispute at 3 (June 8, 1978) (emphasis added) (attached as exhibit I to BYU's Mem. in Supp. of Mot. for Summ.J.).

Similarly, on November 17, 1988, BYU made application to the United States Department of Education for a Title IX exemption from all gender-based regulations which would interfere with the strongly held tenets of BYU's sponsoring church.[30] On January 6, 1989, the Department of Education granted that application. The Department of Education's letter stated:

> [Y]our letter ... states "[t]he teachings of the sponsoring church regarding sexual morality and marriage are inconsistent with housing arrangements in which single students share the same facilities." BYU claims exemption from 34 C.F.R. § 106.32 "to the extent that it interferes with the University's policy of requiring sex-segregated housing by off-campus landlords as a condition of being given approval to house BYU students." Based on these principles, BYU has requested and is granted by this letter, exemption from 34 C.F.R. § 106.32 which addresses housing.

*See* Letter from LeGrees S. Daniels, Assistant Secretary for Civil Rights, United States Department of Education, to Dr. Jeffrey R. Holland, President, Brigham Young University at 2 (Jan. 6, 1989) (attached as exhibit K to BYU's Mem. in Supp. of Mot. for Summ. J.).

---

**29.** The Plaintiffs agree that Title IX allows BYU to segregate by gender in both its on- and off-campus housing but argue that Title IX simply does not address the type of private gender segregation practiced by the Defendant Landlords here. The problem with this argument is that while BYU would have the right under the Plaintiffs' view to require its students to live in sex-segregated off-campus housing, any private landlord who provided off-campus housing to those students would be violating the law. In the

court's view, such a cramped interpretation of Title IX is unacceptable.

**30.** Title IX provides that its prohibition against sex discrimination "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C.A. § 1681(a)(3) (West 1990). This is called a "section 1681(a)(3) exemption."

It is well-settled that the construction of a federal statute by those agencies charged with its administration is entitled to substantial deference. *See, e.g., United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("Authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided, and internal inconsistencies in the statute must be dealt with."). Moreover, it is also well-settled that such a construction should be upheld even if it is not one the court would arrive at. *See, e.g., Department of the Treasury, I.R.S. v. Federal Labor Relations Auth.,* 494 U.S. 922, 928, 110 S.Ct. 1623, 1627, 108 L.Ed.2d 914 (1990) ("We do not lightly overturn [an agency's] construction of the Act it is charged with administering. We must accept ·that· construction . . . even though it is not the one we ourselves would arrive at.") (citations omitted). Given these clear rules, it would be inappropriate for the court to rule on the Plaintiffs' gender discrimination claim in this case because the very conduct that forms the basis for that claim has been specifically approved by both the United States Department of Justice and the United States Department of Education.

### (D). The Plaintiffs' Discriminatory Advertising Claim.

 The Plaintiffs fifth cause of action alleges that all of the Defendant Landlords either now publish or in the past have published advertising which indicates a preference, limitation, or discrimination based on gender, familial status, or religion in violation of the discriminatory advertising provisions of 42 U.S.C.A. § 3604(c). Section 3604(c) makes it unlawful to

make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national

origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C.A. § 3604(c) (West Supp.1994).[31]

 In this case, it is undisputed that the Defendant Landlords advertise their apartments as BYU-approved for male and/or female BYU students. The issue to be decided by the court is whether such advertising violates section 3604(c). In the court's opinion, it does not.

First of all, the challenged advertising makes no mention of religion at all. It merely states that the Defendant Landlords rent their apartments only to students. As noted above, renting only to students while refusing to rent to non-students does not violate the Fair Housing Act. *Cf. Lee v. Minnock,* 417 F.Supp. 436, 439 (W.D.Pa.1976), *aff'd,* 556 F.2d 567 (3d Cir.1977) (noting the "Fair Housing Act does not include in its proscription discrimination upon the basis of occupation"). Thus, if the Plaintiffs are relying on religious discrimination to make out their discriminatory advertising theory in this case, that theory must be rejected outright.

Second, even though some of the Defendant Landlords undoubtedly advertise that they rent apartments only to male and/or female BYU students, such advertising accurately reflects rental practices that are both legal under the Fair Housing Act and specifically authorized by Title IX. As noted above, the implementing regulations to Title IX allow both educational institutions and private landlords to provide sex-segregated housing to students through "solicitation, listing, approval of housing, or otherwise." 45 C.F.R. § 86.32(c)(2) (1993). If such gender segregation is legal, then truthful advertising which describes that practice cannot be illegal under section 3604(c) for, if it were, neither BYU nor the Defendant Landlords could divulge their lawful rental policies to students without *ipso facto* violating the law. Accordingly, the Plaintiffs are precluded from recovering on their discriminatory ad-

---

**31.** Section 3604(c) reaches both subtle as well as overt forms of discriminatory advertising. *See Spann v. Colonial Village, Inc.,* 899 F.2d 24, 29 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990). The issue is whether a "reasonable reader" would feel that the advertising in question discriminates against a group protected by the Fair Housing Act. *Id.*

vertising claim in this case as a matter of law.[32]

### (E). The Plaintiffs' "Terms and Conditions" Discrimination Claim.

▆ The Plaintiffs fourth cause of action alleges that all of the Defendant Landlords segregate their tenants based on either gender or on student status. The Plaintiffs argue that this segregation violates the "terms and conditions" provisions of sections 3604(b) and (d) of the Fair Housing Act.[33] This argument must also be rejected.

In *United States v. Balistrieri,* 981 F.2d 916 (7th Cir.1992), *cert. denied,* — U.S. ——, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993), the Seventh Circuit recognized that sections 3604(b) and (d) of the Fair Housing Act basically create "an enforceable right to truthful information." *Id.* at 929 (citing *Havens,* 455 U.S. at 373–74, 102 S.Ct. at 1121–22). In this case, the Defendant Landlords told the Plaintiffs that they offer separate housing to both students and non-students and that in those buildings or wings of buildings set aside for students, all students are segregated by gender. This information was truthful. Moreover, as noted above, nothing about the Defendant Landlords' rental practices violates the Fair Housing Act. As such, the Plaintiffs cannot recover on their "terms and conditions" discrimination claim in this case as a matter of law.

### (F). The Attorneys' Fees Issue.

▆ Neither the Defendant Landlords nor Intervenor BYU have yet to move the court to award them attorneys' fees and costs in this case. Nonetheless, in anticipation of such a motion, the court has decided to deal with this issue *sua sponte.*

Section 3613(c)(2) of the Fair Housing Act gives a federal district court discretion to award attorneys' fees and costs to any prevailing party. *See* 42 U.S.C.A. § 3613(c)(2) (West Supp.1994).[34] Clearly, both BYU and the Defendant Landlords are the "prevailing parties" in this case.[35] Thus, the only question left to be decided is whether they are entitled to attorneys' fees and costs under section 3613(c)(2). In the court's opinion, they are not.

Under the Fair Housing Act, a district court may award attorneys' fees to prevailing defendants only in two circumstances: (1) where the plaintiff's case was " 'frivolous, unreasonable, or groundless;" and (2) where "the plaintiff brought the case in subjective bad faith." *Brooks v. Center Park Assocs.,* 33 F.3d 585, 587 (6th Cir.1994) (citations omitted) (quoting *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412, 422, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978)). Here, the claims in the Plaintiffs' complaint were all colorable and clearly were not "frivolous, unreasonable, or groundless" in any sense of the word. Moreover, there is no evidence that the Plaintiffs brought this case in "subjective bad faith." Accordingly, the parties should have to bear their own costs and attorneys' fees in this matter.

---

32. Indeed, it seems likely to the court that Congress, in enacting section 3604(c), wanted to ban all advertising which would directly or indirectly advance any of the substantive rental practices prohibited by the Fair Housing Act. If this premise is true, then it reasonably follows that where a practice is permitted under the Fair Housing Act, truthful advertising regarding that practice cannot be a violation of section 3604(c).

33. Section 3604(b) makes in unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion; sex, familial status, or national origin." 42 U.S.C.A. § 3604(b) (West Supp.1994). Similarly, section 3604(d) makes it unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. *Id.* § 3604(d).

34. Section 3613(c)(2) provides:

In a civil action under subsection (a) of this section, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person.

35. The term "prevailing party" is defined in the Fair Housing Act as "having the same meaning as such term has in [42 U.S.C.A. § 1988]." *See* 42 U.S.C.A. § 3602(*o*) (West Supp.1994)

### IV. *ORDER*

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Plaintiffs' motion for summary judgment is hereby denied.

2. The Defendant Landlords' motion for summary judgment is hereby granted.

3. Intervenor BYU's motion for summary judgment is hereby granted.

4. All parties are to bear their own costs and attorneys' fees.