Slip Op. 01-43

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - x

MITCHELL FOOD PRODUCTS, INC.           :
         formerly
SOUTHERN GOLD CITRUS PRODUCTS, INC.,:

                           Plaintiff, :

              v.                       :    Court No. 94-05-00296

UNITED STATES,                         :

                           Defendant.  :

- - - - - - - - - - - - - - - - - - - x

<u>Opinion</u>

[Upon trial of plaintiff's demand
 for return of drawback duties,
 judgment for the defendant.]

                              Decided:  April 12, 2001

    <u>Donald F. Beach</u>, Esq. for the plaintiff.

    <u>Stuart E. Schiffer</u>, Acting Assistant Attorney General; <u>David M. Cohen</u>, Director, and <u>Velta A. Melnbrencis</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Cynthia B. Schultz</u> and <u>Matthew D. Lee</u>); and Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service (<u>Karen P. Binder</u>), of counsel, for the defendant.


    AQUILINO, Judge:  The drawback of duties on imports has been an element of federal governance of America since its inception[1], but the grant thereof has long been held to be a privilege, not a right, with doubt in regard thereto to be resolved in favor of the government.  <u>E.g.</u>, <u>Swan & Finch Co. v. United States</u>, 190 U.S. 143, 146 (1903); <u>Nestle's Food Co. v. United States</u>, 16 Ct.Cust.Appls. 451, 455, T.D. 43199 (1929), and cases cited

---

[1] <u>See</u> Act of July 4, 1789, §3, 1 Stat. 24, 26-27.

therein.  Moreover, the national Constitution, from the beginning, has required an actual stake in a case or controversy asserted under Article III, with the Supreme Court noting that it sometimes remains to be seen whether the factual allegations of a complaint necessary for standing will be supported adequately by the evidence adduced at trial.  Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 n. 31 (1979).

I

The trial of plaintiff's complaint herein has left doubt, both as to standing to actually recover and with regard to the merits of the claim for recovery.

A

Mitchell Food Products, Inc. is introduced by the complaint (at pages 2-3) as the putative plaintiff in the following manner:

> Southern Gold Citrus Products, Inc. (SG . . .) was purchased in 1982 by the Seven-Up Company, a wholly owned subsidiary of Philip Morris, Inc.  Later, when Seven-Up was sold by Philip Morris in 1986, its stock and assets were assigned to Packaged Food & Beverage Company, Inc. (PFB), a wholly owned corporate subsidiary of Philip Morris, Inc. SG continued operations until an unseasonable and severe frost forced it to cease production. After cessation of operations, SG filed drawback claims . . . to cover exportations which occurred prior to the permanent stoppage of production.

> Although ceasing operations, SG retained its corporate charter pending payment of drawback and until the Customs Service had completed Operation "Orange Squeeze." SG's affairs were and are being administered by PFB of Clayton, Missouri 63105.

> Early in 1993, SG was asked to relinquish its tradename as another [] Philip Morris corporate subsidiary wished its use.  SG through PFB did not object to its name transfer, and it was assigned the designation of Mitchell Food Products, Inc.   . . .
>
> . . . [P]laintiff will be referred to as Southern Gold Citrus Products, Inc. or the abbreviated "SG" until this action is concluded, except for the formal, official case designation in the heading of papers submitted to this Court.  The name "Mitchell Food Products, Inc." does not appear on any paper or document relevant to this action, except for the attached exhibit, to the best knowledge and belief of the plaintiff and its attorney.

The exhibit referred to, labelled "A" to the complaint, is simply counsel's notification of Customs of the purported change of name of Southern Gold Citrus Products, Inc. to Mitchell Food Products, Inc.

In their answer on behalf of the defendant, government counsel deny the foregoing material averments "for lack of information" and thus knowing whether either of the encaptioned entities is a proper party plaintiff herein.  Issue having been so joined by the pleadings, and not having been resolved before trial[2], the burden was then on the plaintiff to adduce evidence to substantiate standing to recover on the complaint.  No attempt to do so was made, which failure necessarily invokes the admonition of the Supreme Court that the

> requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process.

---

[2] Cf. defendant's first proposed pretrial order, Schedules B, F-2.

Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).

B

Of course, this court was not at liberty to guide counsel in the prosecution of plaintiff's action. Hence, corporate standing was still an open question when the parties determined to rest at the trial, which focused on the demand for return of $828,186.97 in drawback duties and $90,324.19 in interest. Those amounts had been repaid to Customs following an audit by the Service of a contract with Southern Gold Citrus Products, Inc., which the court will refer to hereinafter as "SGCP", for accelerated payment by the government of substitution manufacturing drawback based upon 19 U.S.C. §1313(b) and (i) and 19 C.F.R. Part 22 (1983). That part of the Tariff Act of 1930, as amended, provided:

**(b) Substitution for drawback purposes**

If imported duty-paid merchandise and duty-free or domestic merchandise of the same kind and quality are used in the manufacture or production of articles within a period not to exceed three years from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported articles, an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported; but the total amount of drawback allowed upon the exportation of such articles, together with the total amount of drawback allowed in respect of such imported merchandise under any other provision of law, shall not exceed 99 per centum of the duty paid on such imported merchandise.

                              *    *    *

**(i) Time limitation on exportation**

> No drawback shall be allowed under the provisions of this section unless the completed article is exported within five years after importation of the imported merchandise.

The contract, a synopsis of which was duly reported at T.D. 84-2(V) (1983), 18 Cust.Bull. & Dec. 7, 12[3], was based upon a lengthy written undertaking by SGCP, copies of which were introduced at trial. The exported products for which drawback was authorized by Customs were specified to be (1) orange juice from concentrate (reconstituted juice), (2) frozen concentrated orange juice, (3) bulk concentrated orange juice, and (4) drink base containing orange solids, all derived from concentrated orange juice for manufacturing. That basic substance, either imported, or duty-paid, duty-free or domestic, was specified to be as defined in the U.S. Food & Drug Administration standard of identity, 21 C.F.R. §146.153, of not less than 55° Brix[4], and to meet the Grade A standard of the U.S. Department of Agriculture, 7 C.F.R. §2852.2221-2231. See Plaintiff's Exhibit 1 and Defendant's Exhibit E, Attach. 2, third page. Among other things, the SGCP undertaking

---

[3] Cf. T.D. 85-110, 19 Cust.Bull. & Dec. 255 (1985), superseding T.D. 80-227(A), 14 Cust.Bull. & Dec. 533, 534-36 (1980).

[4] According to Webster's Third New International Dictionary of the English Language Unabridged 279 (1981), this is "a hydrometer scale for sugar solutions so graduated that its readings in degrees Brix at a specified temperature represent percentages by weight of sugar in the solution". The proper noun is that of its inventor, Adolf F. Brix.

described its contemplated production of the four articles.  It
also made the following commitments:

PROCEDURES AND RECORDS MAINTAINED

We will maintain records to establish:

1. The identity and specifications of the merchandise we designate;

2. The quantity of merchandise of the same kind and quality as the
   designated merchandise we used to produce the exported article;

3. That, within 3 years after receiving it at our factory, we used
   the designated merchandise to produce articles.  During the same
   3 year period, we produced the exported articles.


We realize that to obtain drawback the claimant must establish that
the completed articles were exported within 5 years after
importation of the imported merchandise.

Our records establishing our compliance with these requirements
will be available for audit by Customs during business hours.    We
understand that drawback is not payable without proof of com-
pliance.


INVENTORY PROCEDURES

Our inventory procedures described below will provide all of the
information necessary to satisfy the legal requirements included in
the above heading of "Procedures and Records Maintained".


RECEIPT AND STORAGE OF DESIGNATED MERCHANDISE

The containers of imported frozen concentrated orange juice or
concentrated orange juice for manufacturing are stored separate- ly
upon receipt.  Our receiving records will show:

1. Date of receipt

2. From whom received

3. Quantity received

4. Quality received (degree Brix)

5. Container numbers

6. Import entry number and date of entry

7. When imported and domestic materials are
   comingled [sic] in storage prior to use,
   our accounting method will be on a first-
   in-first-out basis.

PRODUCTION OF EXPORTED ARTICLES

Our production records will reflect the following information:

1. What was produced and date or period of production.

2. What was used to produce the exported article. Our records will indicate the kind and quality of the material used to produce the exported article.

USE OF DESIGNATED ARTICLE

Our records will reflect the date we used the designated merchandise to produce articles.

SHIPPING RECORDS

Our shipping records will indicate the date the exported product was shipped, to whom, the name of the exporting carrier, and the quantity and identity of all products shipped.

BASIS OF CLAIM FOR DRAWBACK

Our claim for drawback will be based on the quantity of concentrated orange juice for manufacturing used to produce the export-ed articles.

AGREEMENTS

The corporation specifically agrees that it will:

1. Comply fully with the terms of this statement when claiming drawback;

2. Open its factory and records for examination at all reasonable hours by authorized government officers;

3. Keep its drawback-related records and supporting data for at least 3 years from the date of liquidation of any drawback claim predicated in whole or in part upon this statement;

4. Keep this statement current by reporting promptly to the Regional Commissioner who liquidates its claims any changes in the number of locations of its offices or factories, the corporate name, or the corporate organization by secession or reincorporation;

5. Keep this statement current by reporting promptly to the Headquarters, U.S. Customs Service all other changes affecting information contained in this statement;

      6. Keep a copy of this statement o[n] file for ready re-
         ference by employees and require all officials and
         employees concerned to familiarize th[e]mselves with
         the provisions of this statement; and

      7. Issue instructions to insure proper compliance with
         Title 19, United States Code, Section 1313 (a) & (b),
         Part 22 of the Customs Regulations and this statement.

Id., fifth to seventh pages.  Pursuant to this agreement, SGCP applied for and received drawback on numerous shipments, including those at issue herein, which are described on Customs Forms 7575-B, Drawback Entry Nos. 84-410909, 85-509909, 85-521807 and 85-521808. See Defendant's Exhibits A, B, C, D.

Subsequent to accelerated payments thereon, Customs undertook to audit those shipments, by which time the Service had revised its regulations which govern drawback per part 191 of 19 C.F.R.  See T.D. 83-212, 17 Cust.Bull. & Dec. 465 (1983).  Each of the resultant audit reports recommended recovery from SGCP of the drawback paid on the aforenumbered entries.  See generally Defendant's Exhibits E, F, G, H.  The recommendation(s) were based upon the following negative conclusions:

1. The 1984 production records were not available.  As
   a result, we could not determine the manufacturing
   time frame of the designated imports, use in pro-
   duction, quantity and quality of the substituted
   materials, CR 191.32(a)(1)(2)(4).

2. The records tracing the transfer of the designated
   import from the receiving department to the produc-
   tion department were not available.  Southern Gold
   used internally designated drums for the production
   of the exported products. The drum numbers indicated
   on the production records were different from the
   drum numbers identified in the receiving records.
   Compliance with Section 191.32(a)(1)(3) of Customs
   Regulations was not met.

* * *

4. The manufacturing time frame of the designated import could not be determined because the production records were not available. Compliance with Section 191.32(a)(3) of the Customs Regulations could not be established.

Defendant's Exhibits G, H, seventh, eighth pages. See Defendant's Exhibit F, eighth page. In addition to the first two conclusions, which were the same for entry No. 84-410909, the report of its audit concluded:

3. The total single strength gallons of orange juice concentrate for manufacturing used to produce orange drink base, super succo orange and citrus punch drink was overstated by 10,614.87 single strength gallons and overstated the duty refund by $3,715.19. The overstatement was due to the mixture of orange wash pulp in the exported products.

Defendant's Exhibit E, eighth page. Thus, with the exception of this one substantive negative conclusion, the audit recommendation(s) were based on lack of the proof required by the SGCP agreement, supra, and the governing Customs regulations.

Some three and a half years later, company counsel undertook to locate the records claimed to support the contested drawback. See, e.g., Defendant's Exhibits I, J. That effort proved only minimally successful, with the Service's "follow-up verification" affirming denial of drawback, save $17,598 on entry No. 84-410909. Defendant's Exhibit L. According to plaintiff's

summons herein, the SGCP entries were finally liquidated in accordance with the audit recommendation(s), modified as indicated with regard to that particular entry. The protest thereof duly filed with Customs was denied "because of certain missing records", and this action commenced pursuant to 28 U.S.C. §1581(a).

(1)

The trial herein afforded the plaintiff another opportunity to establish its entitlement to drawback on the entries in question. It relies on Aurea Jewelry Creations, Inc. v. United States, 13 CIT 712, 720 F.Supp. 189 (1989), aff'd, 932 F.2d 943 (Fed.Cir. 1991), to the effect that testimonial evidence can supplant missing documentation in an action such as this. That case involved a claim for drawback under 19 U.S.C. §1313(a) on imported gold chain and bracelets which were melted into gold ingots by JMS Manufacturing Co., a wholly owned subsidiary of Aurea, and were then exported. Customs rejected the drawback claim "on the ground that Aurea failed to maintain records". 13 CIT at 713, 720 F.Supp. at 190. At trial, Aurea explained that the records were lost when JMS went out of business, whereupon it called the company's former plant manager and former controller to testify with regard to the maintenance of those records, as well as their specific contents. The court accepted their testimony as

"dispel[ling] Customs' underlying doubts in denying drawback"[5] and

thereby held that the plaintiff had made a valid claim for

drawback.  The court of appeals affirmed, noting that a

> claimant's testimonial evidence thus could be used to
> satisfy a two-pronged inquiry -- 1) whether appropriate
> documentation was maintained as required;  and 2) whether
> the contents of that documentation adequately established
> claimant's right to the drawback.

Aurea Jewelry Creations, Inc. v. United States, 932 F.2d 943, 946

(Fed.Cir. 1991).

The plaintiff in the action at bar presents little

conclusive evidence.  Customs denied drawback after audit because

the inventory and production records, required to show the transfer

of imports from one department to the other, were unavailable.  In

lieu thereof, the plaintiff called one witness to the stand,

Rosaria M. Wills, former controller of SGCP, who was competent to

testify regarding the required recordation[6], but who was, at best,

tangentially familiar with the production process[7], e.g.:

> Q  When you were preparing a drawback claim, what
> did you first do?
>
> A  I would . . . receive a bill of lading from the
> warehouse, telling me that [a] shipment was going over-

---

[5] Aurea Jewelry Creations, Inc. v. United States, 13 CIT
712, 715, 720 F.Supp. 189, 192 (1989), aff'd, 932 F.2d 943
(Fed.Cir. 1991).

[6] See, e.g., trial transcript ("Tr."), pp. 50, 67-75, 77-88,
90-124, 133-34.

[7] See, e.g., id. at 36-39.

seas.  And then, [I] would receive a seventy-five-eleven, which is a blue form, notice of exportation.  Then, I would get a copy of the invoice, and . . . the manifest . . . show[ing] the drums that left with that shipment. . . .

And, [I] would combine all this information together, as far as the manifest, the bill of lading, notice of exportation, and the vessel. []

\* \* \*

Then, I would match up all this information . . . and make up all the forms.  Then, . . . with . . . the president of the company, [who] had been a production manager,[] we w[ould] go to the drums from the manifest, to see -- and he would go to his other score sheet, which was different. . . .

\* \* \*

. . . I would check against the score sheet to see if those drums were the ones produced.  But we went another step further, and went back and check[ed] each drum, to be sure that it fit the requirement of the U.S. Customs, as far as [] full drawback . . ..

Tr. at 83-85. In other words per the record, the witness was "not in production"[8] and thus did not have direct knowledge of the makeup of the product.  In fact, all of the drawback claims were filled out with the assistance of the president and former production manager of SGCP.[9]  Hence, the court cannot, and therefore does not, find that Mrs. Wills was sufficiently familiar with production or otherwise satisfied the second prong of Aurea Jewelry, 932 F.2d at 946, supra.

_____

[8] Id. at 157.

[9] See id. at 157-58, 160-61.

(2)

On its part, the defendant adduced evidence at trial which engenders doubt as to whether the exported goods conformed with SGCP's drawback contract. That contract committed the exported bulk concentrated orange juice to "a minimum USDA Grade A score of 94"[10], but that grade apparently was not always achieved. For example, ungraded navel oranges were used in the manufacture of product on occasion: On September 14, 1983, 36 drums of such oranges were sent to the plant. See Defendant's Exhibit T24, pp. 1, 2; Tr. at 149-51. Drink base produced on that date was shipped out on the 28th of that same month. See Defendant's Exhibit A, p. 4; Tr. at 149-51. On December 21, 1983, one bin of navels went to the plant, additional drums were sent three days later, and on December 28th 48 drums were delivered. See Defendant's Exhibit T4, p. 1; Tr. at 140-43. Product from those dates was included in a drawback claim in which 23,022 gallons were cleared on December 30, 1983. See Defendant's Exhibit A, p. 3; Tr. at 140-43. Navel oranges were delivered to the plant for processing on January 4, 1984. See Defendant's Exhibit T9, p. 1; Tr. at 145-47. Some 18,590 gallons of product processed on that day cleared Customs three days later. See Defendant's Exhibit A, p. 3; Tr. at 145-47. Twenty four drums of navels were delivered to the plant on February 28, 1984. See Defendant's Exhibit T21, pp. 1, 4; Tr. at 148-49.

---

[10] Defendant's Exhibit E, Attach. 2, fourth page.

The drawback contract also required the use of essential oils and flavoring components in the manufacture of bulk concentrated orange juice. See Defendant's Exhibit E, Attach. 2, p. 4; Tr. at 164-65. On at least three occasions, the record reflects that such required additives were left out of the manufacturing process. On October 27, 1983, neither essence nor oil was transferred to production, and the natural aroma was returned to stock. See Defendant's Exhibit T1, p. 1; Tr. at 167-68. Product created on that date was shipped on the *Great West* and *Alliance V-156* on the 28th and 30th of October, respectively. See Defendant's Exhibit A, p. 3. On December 26, 1983, again no oils or essences were transferred to the plant, the product of which was exported on the *Aime Enterprise* that same month. See Defendant's Exhibit T7, pp. 1, 2 and Exhibit A, p. 3; Tr. at 169-70. No oils or essences were transferred to the plant for production on February 24, 1984. See Defendant's Exhibit T5, p. 1; Tr. at 168-69. The product manufactured that day was exported on the *Pacer V-84* and the *Lindsey Transport* on February 27th and on March 5th, respectively. See Defendant's Exhibit A, p. 3.

Given such shortcomings, the court finds that Customs was on sustainable ground after audit in denying SGCP drawback. Cf. 19 C.F.R. §191.23(d) (1987).

II

In sum, the burden of proving that either Mitchell Food Products, Inc. or Southern Gold Citrus Products, Inc. is entitled to the return of the drawback duties ceded to the U.S. Customs Service after audit has not been met.   Judgment will enter accordingly.

Decided:   New York, New York
           April 12, 2001


_____
                                              Judge